404 F.2d 441
 Walter D. TEAGUE III, Charlotte Polin, United States
Committee to Aid the National Liberation Front of South
Vietnam, Liberation, Fifth Avenue Vietnam Peace Parade
Committee, and Free School of New York, Inc., Plaintiffs- Appellants,
v.
REGIONAL COMMISSIONER OF CUSTOMS, REGION II and Secretary of
the Treasury of the United States, defendants-Appellees.
 Nos. 1, 2, Dockets 31966, 32077.
 United States Court of Appeals Second Circuit.
 Argued Oct. 4, 1968.
Decided Nov. 14, 1968, Certiorari Denied April 21, 1968, See
89 S.Ct. 1457.
 
 Henry Winestine, New York City (Alan H. Levine, New York Civil Liberties Union, New York City, of counsel), for plaintiffs-appellants.
 Alan G. Blumberg, Asst. U.S. Atty. (Robert M. Morgenthau, U.S. Atty. for the Southern District of New York, H. Thomas Coghill, Asst. U.S. Atty., of counsel), for defendants-appellees.
 Before LUMBARD, Chief Judge, KAUFMAN and HAYS, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 Appellants are the addressees of mail packages containing publications originating in North Vietnam and mainland China. When these packages reach the United States they are detained by the Commissioner of Customs pursuant to the Foreign Assets Control Regulations, 31 C.F.R. 500.808 (1968).[1] The Commissioner sends letters of notice to the addressees advising them of the detention and stating that the material will be released only if Foreign Assets Control issues a license.
 
 
 2
 Appellants did not apply for licenses for the packages addressed to them,[2] but brought this action, asserting that the Foreign Assets Control Regulations and the Trading with the Enemy Act 5(b), 50 U.S.C.App. 5(b) (1964), abridge their first amendment rights, that the statute unconstitutionally delegates legislative power to the President, that the President has unlawfully delegated powers to the Director of Foreign Assets Control, and that the statute and regulations deprive appellants of property without due process of law. They seek a declaratory judgment that the statute and regulations are unconstitutional, that no licenses need be obtained or applied for in transactions involving the importation of North Vietnamese or Chinese publications, and that payment for those publications may be made directly to the publishers rather than into blocked accounts. Appellants also ask for an injunction preventing the Commissioner from continuing to detain the publications already in his possession.
 
 
 3
 Plaintiffs moved for summary judgment or, alternatively, for a preliminary injunction and the convening of a statutory three-judge court. Defendants challenged the court's jurisdiction, and themselves sought summary judgment dismissing the complaint.
 
 
 4
 The district court held that it had jurisdiction under Section 1337 of the Judicial Code, 28 U.S.C. 1337 (1964), but granted summary judgment dismissing the complaint.
 
 
 5
 Appellant Teague thereupon applied for a license. Five weeks later he received a letter from the Federal Reserve Bank of New York requiring that he amplify his application by answering a series of questions. He has not done so. Instead, relying on the delay involved in processing Teague's application, plaintiffs moved pursuant to Fed.R.Civ.P. 60(b) to vacate the order of dismissal, arguing that the regulations involved a far more burdensome procedure than had previously been assumed to exist. The court denied the motion, finding that the length of the delay involved was attributable to the pending litigation, and that while some delay could always be expected it would be closer to 10 days than to 5 weeks.[3]
 
 
 6
 Plaintiffs have appealed from both judgments. We affirm.
 
 I.
 
 7
 Section 5(b) of the Trading with the Enemy Act, 50 U.S.C.App. 5(b) (1964) authorizes the promulgation, during the time of war or other national emergency, of regulations controlling the flow of American currency to foreign nations.[4]
 
 
 8
 In December 1950 President Truman proclaimed the existence of a national emergency. 64 Stat. A454 (1950). That proclamation has never been revoked. Although the proclamation took particular note of 'recent events in Korea and elsewhere,' it also made general reference to 'the increasing menace of the forces of communist aggression.'
 
 
 9
 As this court said in Sardino v. Federal Reserve Bank, 361 F.2d 106, 109-110 (2d Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966):
 
 
 10
 'The declaration has never been revoked; rather it has been repeatedly and recently reaffirmed. * * * While the courts will not review a determination so peculiarly within the province of the chief executive, there can hardly be doubt as to the existence of an emergency today when thousands of United States troops are in action and many more are in readiness around the globe. Plaintiff's contention that the national emergency provision, which came into the statute at the time of the economic crisis of 1933, 48 Stat. 1, is limited to economic emergencies, is sufficiently answered by the breadth of the language. The understanding that the words mean all they say was illustrated by President Roosevelt's freezing the assets of nationals of Norway and Denmark on the invasion of those countries by Germany long before the United States was at war * * *. We take the prompt Congressional ratification * * * as a demonstration of approval of what was already lawful rather than as an indication of doubt.'
 
 
 11
 Acting under the authority of the Trading with the Enemy Act and the declared state of national emergency, the Secretary of the Treasury, to whom the President delegated his rule-making power under the Act, promulgated the Foreign Assets Control Regulations, 31 C.F.R. Part 500 (1968). The relevant portions of those regulations are set forth in the margin.[5]
 
 II.
 
 12
 Plaintiffs challenge the constitutionality of the Trading with the Enemy Act, contending that the Congress has delegated legislative power to the President without fixing standards. And they assert that the powers delegated to the President (if constitutionally delegated to him) are personal to his office and may not constitutionally be delegated to the Secretary of the Treasury or the Director of Foreign Assets Control. These precise contentions were raised and dismissed in Sardino v. Federal Reserve Bank, supra. Far from overruling Sardino, as plaintiffs urge us to do, we reaffirm it as a sound and well-reasoned decision.
 
 
 13
 Plaintiffs contend that even if Sardino is reaffirmed a different set of standards should apply to the present case because the challenges on the basis of overbroad delegations of power involve first amendment claims. Our conclusion that plaintiffs' first amendment rights have not been violated makes it unnecessary to decide that issue.
 
 
 14
 Sardino also provides a sufficient answer to plaintiffs' contention that the statute and the regulations deprive them of property without due process of law.
 
 III.
 
 15
 Plaintiffs' major contention is that the statute and regulations violate the first amendment. They argue both that it is unconstitutional to subject the exercise of first amendment rights-- the receipt of publications-- to 'burdensome and time-consuming administrative procedures,' and that the regulations require the keeping of records that impair the applicants' right to anonymity.
 
 
 16
 The challenged regulations were designed to limit the flow of currency to specified hostile nations: mainland China, North Korea, and North Vietnam. We are presently in a state of armed conflict with North Vietnam; and while we are not at war with either China or North Korea our relations with those nations are hardly peaceful. As we noted in Sardino, 'Hard currency is a weapon in the struggle between the free and the communist worlds.' 361 F.2d at 112. The regulations contribute to the furtherance of a vital interest of the government.
 
 
 17
 It is true that the regulations result in some limitation on the availability of publications and films originating in China, North Korea, and North Vietnam. To the extent of this limitation the regulations impinge on first amendment freedoms. However, restricting the flow of information or ideas is not the purpose of the regulations. The restriction of first amendment freedoms is only incidental to the proper general purpose of the regulations: restricting the dollar flow to hostile nations. Moreover there is no censorship of selected materials; all publications from the specified nations are treated alike. 31 C.F.R. 500.204 App. P108 (1968).
 
 
 18
 The challenged regulations themselves provide for the availability of the foreign publications. They can be, and are, admitted if the payments for them are made into blocked accounts or if the publications are sent as gifts. Id. And the publications are available at 'universities, libraries, (and) research and scientific institutions,' 31 C.F.R. 500.204 App. P108 (1968), which are allowed to import them without restriction as to payments.[6]
 
 
 19
 The Supreme Court has recently said: 'This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest.' United States v. O'Brien, 391 U.S. 367, 376-377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968).
 
 
 20
 Applying the Supreme Court's test here we conclude that the infringement of first amendment freedoms is permissible as incidental to the proper, important, and substantial general purpose of the regulations.
 
 
 21
 Plaintiffs point to the lengthy delays involved in processing the license applications of Teague and Polin and argue that Freedman v. Maryland,380 U.S. 51 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), requires the invalidation on constitutional grounds of such a time-consuming procedure. The government indicated, however, that the delays in processing the Teague and Polin applications were attributable to this lawsuit, because the Treasury Department was forced to coordinate its activities with the Justice Department. The district court found that a license application can typically be processed within 10 days. In any event, we do not consider Freedman v. Maryland controlling in a situation such as this. Freedman was concerned with the length of time required to adjudicate whether a film was obscene in light of the presumption of unconstitutionality borne by any system of prior restraints of expression, see 380 U.S. at 57, 85 S.Ct. 734, and cases cited. Here, by contrast, there is no inquiry into the content of detained material. The only delay is that required to determine that money is not being sent to one of the designated nations; there is no design to limit the free flow of ideas.
 
 
 22
 Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), is not apposite. As Mr. Justice Brennan noted in his concurring opinion in Lamont, id. at 309, 85 S.Ct. 1493, the solicitor general expressly conceded that no compelling governmental interest required enactment of the statute there called in question. The only purpose of the statute was to protect the sensibilities of recipients of Communist political propaganda who might be offended by getting publications espousing unpopular ideas. Here the government's purpose is obviously enormously more important and substantial.
 
 
 23
 Finally, plaintiffs contend that the licensing procedure violates their fifth amendment right against selfincrimination. They rely on Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), and Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). We find those cases, and Albertson v. Subversive Activities Control Bd., 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), to be inapplicable. By answering the questions posed on the required forms in those cases petitioners could have found themselves subjected to criminal prosecution. The information to be supplied by these plaintiffs on the forms required here would have no tendency to incriminate them.
 
 
 24
 The judgments of the district court are affirmed.
 
 
 
 [1]
 31 C.F.R. 500.808 Customs Procedures; merchandise specified in 500.204
 (a) With respect to merchandise specified in 500.204, whether or not such merchandise has been imported into the United States, directors of customs shall not accept or allow any:
 (1) Entry for consumption (including any appraisement entry, any entry of goods imported in the mails, regardless of value, and any other informal entries); * * * until either;
 (i) A specific license pursuant to this chapter is presented, (or)
 (ii) Instructions from the Foreign Assets Control, either directly or through the Federal Reserve Bank of New York, authorizing the transaction are received * * *.
 
 
 [2]
 Plaintiff Charlotte Polin applied for the required licenses after the commencement of this action but before its dismissal by the district court. It took 8 weeks for the license to be issued and plaintiffs argued below that such a delay was an excessive burden to be placed on the exercise of first amendment rights. The court found, however, that the length of the delay was 'apparently due to the pendency of this litigation as well as to (Polin's) own tardiness in supplying the required information,' and that the normal delay should be only about 10 days. Miss Polin later applied for another license, which was processed within 10 days
 
 
 [3]
 See note 2 supra
 
 
 [4]
 During the time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise--
 (A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, * * * and
 (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportion of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest,
 by any person, or with respect to any property, subject to the jurisdiction of the United States * * *; and the President shall, in the manner hereinabove provided, require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in this subdivision either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of this subdivision * * *.
 
 
 [5]
 500.201 Transaction involving designated foreign countries or their nationals; effective date
 (a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of any designated foreign country, or any national thereof, or such transactions involve property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
 (3) the exportation or withdrawal from the United States of gold or silver coin or bullion, currency or securities, or the earmarking of any such property, by any person within the United States.
 (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:
 (1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of of property by any person subject to the jurisdiction of the United States; and
 (2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.
 (d) The term 'designated foreign country' means a foreign country in the following schedule . . . :
 SCHEDULE
COUNTRY AND EFFECTIVE DATE
1. China: December 17, 1950.
2. North Korea . . .: December 17, 1950.
3. North Viet-Nam . . . : May 5, 1964.
500.204 Importation of and dealings in certain merchandise.
 (a) Except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, no person subject to the jurisdiction of the United States may purchase, transport, import, or otherwise deal in or engage in any transaction with respect to any merchandise outside the United States if such merchandise is:
 (1) Merchandise the country of origin of which is China (except Formosa), North Korea, or North Viet-Nam * * *.
 
 
 [500]
 204 Appendix
 (108) Publications and films from China, North Korea and North Viet-Nam. Publications anf films originating in mainland China, North Korea or North Viet Nam are licensed for commercial importation provided all payments due to the suppliers are made into blocked accounts. Publications and films originating in mainland China, North Korea, and North Viet Nam are also licensed without restrictions as to method of payment under programs approved by the Librarian of Congress or the National Science Foundation for universities, libraries, research and scientific institutions. Such publications and films are also licensed in exchange for publications from the United States. Additionally, such publications and films are licensed when the Office of Foreign Assets Control is satisfied that they are bona fide gifts to the importers and that there is not and has not been since the effective date any direct or indirect financial or commercial benefit to designated countries or nationals thereof from the importations.
 
 
 [6]
 The existence of an exception that allows a small sum of money to flow to the hostile nations in order to protect first amendment freedoms by making the foreign publications available to those institutions that can give the publications the broadest exposure to the public and that can make the greatest use of them for purposes of study, does not justify an attack on the basic regulation