**VETERANS AND RESERVISTS FOR PEACE IN VIETNAM, Appellant,**

v.

**REGIONAL COMMISSIONER OF CUSTOMS, REGION II and Secretary of the Treasury of the United States.**

No. 71–1391.

United States Court of Appeals, Third Circuit.

Argued March 21, 1972.

Decided May 4, 1972.

Sanford Jay Rosen, Asst. Legal Director, American Civil Liberties Union, New York City, for appellant.

Robert L. Keuch, Dept. of Justice, Washington, D. C., for appellees.

1. Section 5(b) authorizes the President, in time of war or national emergency, to regulate or prohibit transactions "involving, any property in which any foreign country or a national thereof has any interest." This authority was delegated to the Secretary of the Treasury in 1942. 7 Fed. Reg. 1409 (February 12, 1942); Executive Order 9693 (July 6, 1942). The Secretary, in turn, has delegated his authority to the Director of the Office of Foreign Assets Control. Treas. Dept. Order No. 120, December 19, 1950, as amended, 32 Fed.Reg. 3472.

This country is currently in a state of national emergency. This emergency was first declared by President Truman on December 16, 1950, and was reaffirmed by Proclamation 3004, 67 Stat. C31, January 17, 1953. Subsequent Presidents have recognized the continued existence of this national emergency. Executive Order No. 10896, 3 C.F.R. (November 29, 1960); Executive Order No. 10905, 3 C.F.R. (January 14, 1961); Executive Order No. 11037, 3 C.F.R. (July 24, 1962); Executive Order No. 11387, 33 Fed.Reg. 47 (January 1, 1968). *See* Sardino v. Federal Reserve Bank, 361 F.2d 106 (2d Cir.), cert. denied, 385 U.S. 898, 87

Before ADAMS, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Plaintiff has frontally assaulted the Trading with the Enemy Act, 50 U.S.C. App. § 5(b) [1] and the Foreign Assets Control Regulations, 31 C.F.R. Part 500 [2] as being unconstitutional facially and as applied in this case. The attack is essentially two-pronged: the statute and regulations establish an unconstitutional delegation of legislative power without adequate standards, and violate the First Amendment by prohibiting the receipt of unsolicited publications unless the addressee obtains a license, submits to a permanent record his desire to receive the proscribed publications, and proves he has made no payment.

The facts of this controversy are not in dispute. By letter dated February 17, 1970, plaintiff, an unincorporated association, received notice from the

S.Ct. 203, 17 L.Ed.2d 130 (1966); Teague v. Regional Commissioner of Customs, 404 F.2d 441 (2d Cir. 1968), cert. denied, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969); Nielson v. Secretary of the Treasury, 137 U.S.App.D.C. 345, 424 F.2d 833 (1970).

2. Section 500.204(a) of the Foreign Assets Control Regulations prohibits unauthorized dealings in merchandise orginating in, *inter alia*, North Vietnam. Paragraph 108 of the Appendix to Section 500.204 provides for licenses for the importation of films and publications from North Vietnam, North Korea and Communist China where such films or publications are bona fide gifts not involving "any direct or indirect commercial benefit to [the] designated countries," where payments for such items are made into blocked accounts, or where such materials are sent to libraries, universities, etc., or where they are received in "exchange for publications from the United States."

Section 500.801(b) sets forth the licensing procedure, and Section 500.803 provides that the Office of Foreign Assets Control or the Federal Reserve Bank of New York will make final decisions respecting applications for licenses.

Regional Commissioner of Customs that a shipment of Red Chinese literature from North Vietnam had been detained and would not be released until a license had been secured. Plaintiff alleges that the publications, copies of an English language newspaper, were unsolicited and that plaintiff had no intention of making payment to anyone for them. However, rather than apply for a license, plaintiff brought suit in the district court for injunctive relief and moved for summary judgment, or in the alternative, for a preliminary injunction and the formation for a three-judge court under 28 U.S.C. §§ 2282, 2284 (1970). Defendants cross moved for summary judgment, and their motion was granted. The district court relied on Teague v. Regional Commissioner of Customs, 404 F.2d 441 (2d Cir. 1968), cert. denied, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969).[2a]

**I**

Plaintiff's first argument is that the statute unconstitutionally delegates legislative powers without appropriate standards. In support of this contention, plaintiff has traced the history of predecessor statutes from the original Trading with the Enemy Act of 1917, 40 Stat. 414, to demonstrate that the present statute "permits profoundly drastic action at the whim of the administrator" that "may be [utilized] to carry out" domestic economic policy.[3] The only restriction on this vast power,

plaintiff asserts, is that it can be exercised solely in time of war or other national emergency declared by the President, and since a President's declaration of national emergency is unreviewable,[4] "the statute contains no limitations whatsoever." Therefore, according to plaintiff, the statutory grant of authority is repugnant to the Constitution, A. L.A. Schecter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L. Ed. 1570 (1935), especially where the overbreadth of the statute affects First Amendment rights. United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L. Ed.2d 508 (1967).

■ We note that the statute contains two express limitations: (1) it becomes operative only during "the time of war" or "any other period of national emergency declared by the President," and (2) it applies only to "property in which any foreign country or any national thereof has or has had any interest." Ordinarily, when dealing with matters of foreign relations, Congress may lawfully delegate to the President broader discretion than would be permissible with regard to domestic affairs. Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); United States v. Curtiss-Wright Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Were the standards expressed in these cases the only criteria of relevance here, we would

---

**2a.** The district court denied the alternative relief on the ground that a substantial constitutional question had not been presented in view of the following cases: Kaufman v. Societe Internationale, 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853 (1952); Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949); United States v. China Daily News, 224 F.2d 670 (2d Cir.), cert. denied, 350 U.S. 885, 76 S.Ct. 138, 100 L.Ed. 780 (1955); United States v. Quong, 303 F.2d 499 (6th Cir.), cert. denied, 371 U.S. 863, 83 S.Ct. 119, 9 L.Ed.2d 100 (1962); Sardino v. Federal Reserve Bank, *supra*, Teague v. Regional Commissioner of Customs, *supra*. We agree

with this conclusion of the district court, but because the facts here differ somewhat from those present in *Teague*, we deem it necessary to set forth our reasoning in this opinion.

**3.** However, there is nothing in this case to indicate that the statute has been utilized other than in connection with foreign relations.

**4.** *See* Teague v. Regional Commissioner of Customs, 404 F.2d 441 (2d Cir. 1968), cert. denied, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969); Sardino v. Federal Reserve Bank, 361 F.2d 106 (2d Cir. 1966), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1968).

have no difficulty holding that the delegation does not render the statute unconstitutional, especially since the national emergency qualifies as a "time of crisis."

But the matter is not that simple. Clearly, items entitled to First Amendment protection may be encompassed within the definition of the term "property." When the operation of an otherwise valid law "clashes with those individual liberties protected by the Bill of Rights, it is our 'delicate and difficult task' to determine whether the resulting restriction on freedom can be tolerated." United States v. Robel, 389 U.S. at 264, 88 S.Ct. at 424. In deciding "whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal" it is "necessary to measure the validity of the means adopted by Congress against both the goal it has sought to achieve and the specific prohibitions of the First Amendment." Id. at 268 n. 20, 88 S.Ct. at 426. Thus there are two essential criteria: (1) the legislative purpose must be legitimate, and (2) the means of achieving that purpose must not violate the First Amendment.

There is little doubt regarding the propriety of the purpose of the Trading with the Enemy Act. Its obvious goal is to prevent countries such as North Vietnam and Communist China from deriving any economic benefit from transactions with persons subject to the jurisdiction of the United States. Considering the state of our relationship with North Vietnam, and that money is an important weapon in any international struggle, we conclude that the Congressional design under-pinning the Act is wholly proper. See Banco National de Cuba v. Sabbatino, 376 U.S. 398, 84 S.

Ct. 923, 11 L.Ed.2d 804 (1964); Teague v. Regional Commissioner of Customs, supra; Sardino v. Federal Reserve Bank of New York, supra.

The question whether the means adopted by Congress to reach its goal—delegation of authority to promulgate regulations—comport with the First Amendment does not admit to facile solution. Most, if not all, of the authoritative Supreme Court cases dealing with this issue concern instances of delegation of authority where the function of the delegatee was to determine only whether certain materials were protected by the First Amendment. See e. g., United States v. Thirty-Seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968); Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649 (1965).[5] However, none of those cases involved the precise problem confronting us: whether Congress may delegate authority to regulate so broad that the regulation of First Amendment protected rights incidentally falls within the ambit of the authority.

In other contexts, though, the Supreme Court has validated statutes and ordinances regulating various activities although such regulation incidentally curtailed First Amendment rights. In Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), the Supreme Court upheld an anti-littering ordinance directed against advertising handbills despite the fact that the handbills also contained materials protected by the First Amendment.[6] And in

5. Similarly, in *Robel, supra,* the key to the decision was that the operative effect of the statute there invalidated depended upon "the exercise of an individual's right of association, which is protected by the provisions of the First Amendment." 389 U.S. at 263, 88 S.Ct. at 423. (footnote omitted).

6. *See also,* Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). In that case, the Supreme Court upheld a statute which made it unlawful to solicit the sale of eyeglasses by use of the advertising media.

American Communications Assn. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L. Ed. 925 (1950), the Supreme Court explained:

> "Those who, so Congress has found, would subvert the public interest cannot escape all regulation because, at the same time, they carry on legitimate political activities." *Id.* at 412, 70 S.Ct. at 691.

Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), indicated that a state could nondiscriminately deny to demonstrators access to its property, provided such denial was "evenhanded." *Id.* at 47–48, 87 S.Ct. 242.[7] An antipicketing statute was held valid and not overly broad in Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), since it did not prohibit picketing unless it obstructed or unreasonably interfered with ingress or egress to or from a courthouse, and there was no disclosure in the record that the officials had acted in bad faith or that the statute was enacted to halt the appellants' picketing.

 The essence of these cases is that a statute is not overly broad and thus violative of the First Amendment merely because it regulates incident to its scheme protected activities or property. It is only where the statute *directly* regulates speech or expression arguably protected by the First Amendment, or where as its mechanism the statute has granted discretion to a delegatee to determine whether particular items of expression may be prohibited on the basis of their content, that the question of overbreadth arises. Section 5(b) does not directly regulate First Amendment protected material, rather it controls transactions concerning property in which an enemy has an economic interest. The purport of the statute is clear on its face, and therefore provides guidance to the delegatee with regard to the exercise of his functions. Were Section 5(b) applied by the President or his delegatee in such fashion that only First Amendment materials were excluded or regulated, we would have the power to construe that statute in a manner which would avoid the Constitutional defect. United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1972). However, that case is not before us, and therefor we need not so interpret the legislation now.[8] Even if the Act were subject to an overly broad construction, such would not preclude its application "to prior conduct foreseeably within its valid sweep." Id. at 375, n. 3, 91 S.Ct. at 1408.

## II

Plaintiff next assails the statute and regulations with the charge that the regulatory scheme constitutes a prior restraint on its First Amendment freedoms. Here, using Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), as ammunition, plaintiff trains its weapons on the licensing procedure. This procedure, it is contended, encompasses all of the vices which rendered the statutory scheme at issue in *Lamont* invalid in that: (1) it imposes the burden on recipients of un-

---

7. *See also*, Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), where the Supreme Court upheld an ordinance prohibiting the use of sound trucks in the public streets. Mr. Justice Frankfurter's concurring opinion stressed that the ordinance applied to the medium and not to the content of the message.

 Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959) upheld, in the face of a First Amendment challenge, the validity of a treasury regulation applied so as to deny a deduction for ordinary and necessary business expense contributions to a lobbying organization.

8. There is a serious question whether plaintiff has the standing necessary to raise the argument that the statute is void for overbreadth because it might be utilized only to restrict access to materials protected by the First Amendment. *See* Mr. Justice Harlan's concurring opinion in *Thirty-Seven Photographs*, 402 U.S. at 377–378, 91 S.Ct. 1400, 28 L.Ed.2d 822, in which he further articulates the reasoning of the court in Section II of the majority opinion.

dertaking the affirmative act of completing a questionnaire and awaiting the delay of administrative process before the materials may be released; (2) it grants unlimited discretion to refuse licenses to the Office of Foreign Assets Control; (3) the filing of an application for a license results in a loss of anonymity because a permanent public record is thereby created; and (4) the procedure improperly places upon the applicant the burden of proof that a license is warranted.

But the *Lamont* case is not as broad as plaintiff asserts. As the concurring opinion points out:

> "[W]e 'have consistently held that only a compelling [governmental] interest in the regulation of a subject within [governmental] constitutional power to regulate can justify limiting First Amendment freedoms.' NAACP v. Button, 371 U.S. 415, 438 [83 S.Ct. 328, 341, 9 L.Ed.2d 405]. The Government's brief expressly disavows any support for this statute 'in large public interests such as would be needed to justify a true restriction upon freedom of expression or inquiry.'" 381 U.S. at 308–309, 85 S. Ct. at 1497.

◼ Here, as discussed in Section I, *supra*, the Government has a compelling interest in regulating the flow of money to certain countries. And because plaintiff has not alleged—indeed, with regard to the posture of the case as plaintiff fashioned it, could not allege—that the Office of Foreign Assets Control has acted in bad faith, we must assume that the responsible officials will carry out their duties in accordance with constitutionally acceptable standards. It is in light of these factors that the licensing scheme must be evaluated.

### A. Burden and Delay

In order to obtain a license, the applicant must submit either of two forms: TFAC–1 or TFAC–4. The first form applies solely to commercial importa-

tions, and since the importation here is not commercial, that form need not be further considered. Form TFAC–4, which applies to noncommercial importation, is rather brief. It requests only the following information: (1) the applicant's name, address and occupation; (2) the description and value of the merchandise; (3) the details of purchase, if the merchandise was purchased; (4) whether the applicant paid or intends to pay for the materials, and if so, how much and to whom; (5) if the merchandise was purchased or ordered, whether the applicant had knowledge of the Foreign Assets Control Regulations; (6) the use to be made of the materials; (7) whether the applicant has ever applied for such a license in the past. In view of the great importance in assuring that United States currency does not fall into the wrong hands, we do not believe that the burden imposed by answering the interrogatories on this form are unreasonable or excessive.

◼ With regard to delay, we observe that the Notice of Detention contemplates 45 days, which may be extended to a maximum of ninety days. Because plaintiff did not request a license, we do not know exactly how long the administrative process takes, but if the Office of Foreign Assets Control expedites applications for licenses for materials protected by the First Amendment, it does not appear that this delay will be unduly burdensome. Because the administrative determinations go only to the factual questions regarding the financial aspects of the transaction and not to a decision based on the contents of the materials, this delay would not appear to be extraordinarily lengthy. *See Thirty-Seven Photographs*, 402 U.S. at 373, 91 S.Ct. 1400, 28 L.Ed.2d 822.

### B. Unlimited Discretion

◼ It does not seem that the regulations vest unlimited discretion in the Government to deny a license. The whole thrust of the Act and regulations is to ensure that certain countries do not

achieve economic benefit from transactions involving persons subject to the jurisdiction of the United States. If the Office of Foreign Assets Control attempted to apply any other standard, its actions might well be unconstitutional. *See* Kent v. Dulles, 357 U.S. 116, 78 S. Ct. 1113, 2 L.Ed.2d 1204 (1958), *cf.* United States v. Thirty-Seven Photographs, *supra*; Lamont v. Postmaster General, *supra*. But such a case is not now before us, and we hold here only that so long as the Government applies the standards implicit in the Act and regulations, the discretion vested in the Office of Foreign Assets Control is not so broad as to be unconstitutional.

## C. Loss of Anonymity

■ We find troublesome the loss of anonymity accompanying the maintenance of records regarding the importation of First Amendment materials. *See Lamont, supra*. However, the necessity to maintain records of this sort appears to be an important adjunct to the adequate control and regulation of the flow of cash to certain countries. Such records enable the Office of Foreign Assets Control to check the prior importation of materials from the enumerated countries by individual applicants, and perhaps facilitate the detection of patterns of conduct indicative of violations of the act. Where there is a need to regulate, it is essential to record the regulatory activity. We hesitate to invalidate such requirement without allegations or proof that the purpose of the recordation is to embarrass the recipient of materials or to chill the exercise of his right to receive them. Our disquietude would be considerably ameliorated if the Office of Foreign Assets Control would keep their records confidential so as to lessen the impact that may be caused by the retention of such documents.

## D. Burden of Proof

■ The Notice of Detention received by plaintiff stated, with regard to license applications, that:

> "Such applications are, however, normally granted only if they are supported by clear and complete documentary proof of the non-Chinese origin of the merchandise affected by the Regulations. * * * It should be noted that the Foreign Assets Control does not regard statements of sellers or shippers (or documents based thereon) as affording a basis for issuing licenses."

Here, there is no dispute regarding the country of origin of the merchandise. Rather, in this case, the only inquiry before the Office of Foreign Assets Control would be whether payment would be made, if at all, in such manner that the funds would be likely to be available to the listed countries. In this respect, and in the context of this case, Form TFAC–4 asks only: "Did the applicant pay or does he intend to pay for this merchandise, directly or indirectly * * *?" The simple answer "No", folowed by the certification of truth printed on the form and the applicant's signature would satisfy the Act and regulations and thereby mandate the materials be released, unless the Office of Foreign Assets Control possessed contrary information from another source. This duty does not appear to be excessively onerous, and in the absence of proof that a more convincing showing is required by the Government, we cannot hold that the burden is so high as to render the Act and regulations unconstitutional as applied.[9]

## III

■ For the reasons stated in Sections I and II, we hold with regard to the facts of this case that Section 5(b)

---

9. Had the plaintiff applied for a license, and in such application, answered the question in the negative, and were such application then denied, with or without a hearing or statement of reasons, we would be faced with different Constitutional questions that we need not now resolve.

of the Trading with the Enemy Act and Part 500 of the Foreign Assets Control Regulations are Constitutional both facially and as applied.

Accordingly, the order of the district court will be affirmed.