**CAPITAL CITIES/ABC, INC., Plaintiff,**

v.

**Nicholas BRADY, Secretary of the Treasury, R. Richard Newcomb, Director, Office of Foreign Assets Control, Defendants.**

No. 89 Civ. 8006 (JES).

United States District Court,
S.D. New York.

June 29, 1990.

**1008**

Wilmer, Cutler & Pickering (Lloyd N. Cutler, A. Douglas Melamed, W. Dawn Busby, James M. Carr, of counsel), Washington, D.C., Patterson, Belknap, Webb & Tyler (Philip Forlenza, of counsel), New York City, for plaintiff.

Cahill Gordon & Reindel (Floyd Abrams, Amy Glickman, of counsel), New York City, for amici curiae, CBS, Inc. and Nat. Broadcasting Co., Inc., in support of plaintiff.

Department of Justice (Anne L. Weismann, Richard R. Brown, of counsel), Washington, D.C., for defendants.

U.S. Dept. of Treasury (Susan Klavens Hutner, of counsel), Washington, D.C., for defendant Office of Foreign Assets Control.

## OPINION AND ORDER

SPRIZZO, District Judge:

## PRELIMINARY STATEMENT

The issue presented by these cross-motions for summary judgment is whether the refusal of the United States Department of the Treasury ("Treasury Department") to license an agreement for the exclusive live broadcasting rights of the 1991 Pan American Games is consistent with the Trading With The Enemy Act and the First Amendment.

## STATEMENT OF FACTS

Section 5(b) of the Trading With the Enemy Act of 1917, 50 U.S.C.A.App. § 5(b) (West Supp.1990) ("TWEA"), authorizes the President, in times of national emergencies, to impose embargoes on transactions between persons subject to the jurisdiction of the United States and countries designated as hostile by the President.[1] *See generally Regan v. Wald,* 468 U.S. 222, 226 n. 2, 104 S.Ct. 3026, 3029 n. 2, 82 L.Ed.2d 171 (1984). In 1962, President Kennedy declared a national emergency and placed an embargo on Cuba. *See id.* at 226, 104 S.Ct. at 3030. Pursuant thereto, the Treasury Department, the agency charged with administering the TWEA, delegated this authority to the Office of Foreign Assets Control ("OFAC") which in turn promulgated the Cuban Assets Control Regulations ("Regulations"). *See* 31 C.F.R. pt. 515 (1989). The Regulations prohibit transactions with either the Cuban government or Cuban nationals, *see* 31 C.F.R. § 515.201(a),[2] unless such transactions fall within the scope of either a general or specific licensing provision.

Parties to a transaction falling within a general licensing provision may proceed without prior OFAC approval. These provisions authorize, *inter alia:* 1) transactions of common carriers incident to the

---

1. In pertinent part, § 5(b)(1)(B) authorizes the President to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest." 50 U.S.C.A. App. § 5(b)(1)(B).

2. The TWEA originally applied to both wartime and peacetime emergencies. However, in 1977,

Congress amended § 5(b) to limit its applicability to wartime. Peacetime emergencies are now governed by the International Emergency Economic Powers Act. *See* 50 U.S.C. § 1701 *et seq.* (1982). Nevertheless, the declaration of the Cuban emergency and the Regulations promulgated thereunder were continued under the TWEA by a "grandfather" clause and continue in force today. *See* Pub.L. No. 95–223, § 101(b); *see generally Wald, supra,* 468 U.S. at 227–29, 104 S.Ct. at 3030–31; *De Cuellar v. Brady,* 881 F.2d 1561, 1563 (11th Cir.1989).

receipt and transmission of mail, 31 C.F.R. § 515.542(a); 2) transactions incident to the use of satellite channels for the transmission of television news and news programs originating in Cuba by United States news organizations, *id.* at 515.542(b); and, 3) transactions in connection with travel to Cuba for the purpose of gathering news, making news or documentary films, or professional research and similar activities. *Id.* at 515.560(a)(1)(ii).

The OFAC may authorize transactions not falling within a general licensing provision by granting a specific license issued on a case by case basis. *See, e.g.,* 31 C.F.R. §§ 515.542(c), 515.560(b), 515.565(b). However, the Regulations explicitly prohibit the issuance of specific licenses for transactions involving the payment to Cuba for television rights, appearance fees, royalties, pre-performance expenses, or other such payments in connection with or resulting from any public exhibition or performance in the United States or in Cuba. *Id.* at § 515.565(c)(1).

In 1988, Congress amended § 5 to exempt certain transactions from the reach of the TWEA. *See* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107 (1988) ("Berman Amendment"). The Berman Amendment provides that the President's authority under § 5 does not:

> include the authority to regulate or prohibit, directly or indirectly, the importation ... or the exportation ..., whether commercial or otherwise, of publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, *or other informational materials,* which are not otherwise controlled for export under section 5 of the Export Administration Act of 1979 or with respect to which no acts are prohibited by chapter 37 of title 18, United States Code.

50 U.S.C.A. App. § 5(b)(4) (emphasis added).

On February 2, 1989, the Regulations were amended in an attempt to comply with the Berman Amendment. *See* 54 Fed. Reg. 5229, 5231 (1989); Declaration of R. Richard Newcomb ("Newcomb Decl.") at ¶ 10. According to the new Regulations, all transactions relating to "informational materials" are currently authorized by a general license. *See* 31 C.F.R. §§ 515.-206(a), 515.545(b).[3] The definition of "informational materials," however, excludes "intangible items such as telecommunications transmissions," *see id.* at § 515.332(b)(2), and the Regulations prohibit "transactions related to informational materials not fully created and in existence at the date of the transaction." *Id.* at § 515.206(c). Moreover, the "remittance of royalties or other payments relating to works not yet in being" is precluded. *Id.* at § 515.545(b).

Plaintiff, Capital Cities/ABC, Inc. ("ABC"), owns and operates the ABC Television Network which televises, *inter alia,* various sporting events. *See* Declaration of Dennis Lewin ("Lewin Decl.") at ¶ 2. The Pan American Games ("Games") are a multidiscipline sports competition among 39 member nations which, like the Olympics, are held in a different member nation every four years. *See* Affidavit of Robert H. Helmick ("Helmick Aff.") at ¶ 3–4. The Games, first held in 1951, are organized and run by the Pan American Sports Organization ("PASO"), an international organization headquartered in Mexico. The PASO is composed of sports organizations from the member nations, including organizations from the United States and Cuba. *Id.*

In 1986, PASO determined that the 1991 Games would be held in Havana, Cuba. *See* Helmick Aff. at ¶ 5. Thereafter, in October 1988, ABC decided to place a bid with PASO for the rights to televise the 1991 Games, which was eventually accepted. In consideration for the exclusive rights to broadcast the Games live, ABC agreed to pay PASO $8.7 million with the express understanding that PASO would

---

**3.** Section 515.545(b) authorizes the payment of royalties for works in being that are "repro- duced, translated, subtitled, or dubbed."

remit seventy-five percent of this sum, $6.5 million, to Cimesports, S.A., a Cuban entity and the host organizer of the Games. *See* Declaration of Joel E. Lulla ("Lulla Decl.") at ¶ 2; Declaration of Stephen J. Solomon ("Solomon Decl.") at ¶ 11.

In early June 1989, ABC notified the OFAC of this agreement, and after the OFAC informed ABC that a specific license was necessary, ABC applied for "a license covering all necessary transactions involving Cuba in connection with the television coverage and transmission of the 1991 Pan American Games." *See* Letter dated June 12, 1989 (annexed to Plaintiff's Notice of Motion as Ex. 1); Lulla Decl. at ¶ 3. In its application, ABC stated that it would pay a fee to a Cuban national and "incur additional production expenses in Cuba." *See* Notice of Motion at Ex. 1.

Negotiations between ABC and the OFAC with respect to the license were commenced, and on June 23, 1989, ABC notified the OFAC that it did not believe that the transaction required a specific license and that the OFAC's position was contrary to the intent of the Berman Amendment. *See id.* at Ex. 2. Thereafter, on September 18, 1989, ABC withdrew its application, stating that it was engaged in negotiations to obtain the broadcast rights in a different transaction with different parties. *See id.* at Ex. 3. No further description of that transaction was proffered.

However, by letter to the OFAC dated November 16, 1989, ABC expressed its intention to proceed as originally planned and once again asserted that the transaction did not require a license. ABC further contended that live broadcast coverage of the Games was, in any event, authorized by the general licenses provided for "travel and importation in connection with news gathering and similar activities." *See id.* at Ex. 4. In response, the OFAC stated that it would grant ABC a license if royalty pay-

ments were made into a blocked account pursuant to 31 C.F.R. § 515.508(a)[4] and if travel expenses were kept to a minimum.

In addition, the OFAC informed ABC that although sports broadcasts were entertainment and not news, ABC could avail itself of the news gathering general license if no royalty payment was made and provided that ABC followed several guidelines.[5] *See* Notice of Motion at Ex. 5. Alternatively, the OFAC noted that ABC could import videotapes of the Games so long as ABC did not "fund, or provide or contract for services in connection with, the production of the tapes." In sum, the OFAC denied the renewed application for a specific license on the basis suggested by ABC "because this transaction would result in a very substantial payment to Cuba, [and was therefore] contrary to the current foreign policy of the United States." *Id.*

ABC concluded that the options offered by OFAC were unacceptable because ABC's agreement with PASO required that funds be remitted to Cuba. *See* Lulla Decl. at ¶ 5; Rana Decl. at ¶ 7. Therefore, ABC brought this action seeking a declaratory judgment that the Berman Amendment and/or the Constitution authorizes the transaction proposed by ABC, *see* Complaint, Prayer for Relief, at ¶ 1; that the Regulations are null and void to the extent that they regulate the importation of television signals and related informational materials, *see id.* at ¶ 2; and that the Berman Amendment, the Administrative Procedures Act and/or the United States Constitution bar the Government from initiating any proceeding against ABC to prohibit ABC from televising the 1991 Games. *Id.* at ¶ 3. ABC also seeks a permanent injunction "barring Defendants from ... regulating ABC's televising of the 1991 Games." *Id.* at ¶ 4.

## DISCUSSION

The principle issues raised by ABC's request for a declaratory judgment are 1)

---

**4.** Blocked assets cannot be distributed, withdrawn or transferred without a specific license. *See* 31 C.F.R. § 515.319; Newcomb Decl. at ¶ 18, 21.

**5.** According to the OFAC, to be entitled to the general license, ABC's activities had to "essentially consist of reports or documentaries of, or information about, the Games and related events accessible to the press on a non-exclusive basis." Notice of Motion at Ex. 5.

whether the Regulations are consistent with the terms of the Berman Amendment, and 2) assuming that the language of the Berman Amendment is ambiguous, whether this Court must defer to the OFAC's interpretation thereof pursuant to *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). ABC contends not only that such deference is not required, but that such deference would be inconsistent with the First Amendment, and would thus be constitutionally impermissible.[6]

■ Where Congress has specifically addressed the precise question presented in either the plain language of the statute or its clear legislative history, deference to a contrary agency interpretation is neither required nor permitted. *See Chevron, supra,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. In this case, however, the phrase at issue, "other informational materials," is clearly susceptible to more than one reasonable interpretation.[7]

Ordinarily, the word "materials" refers to "matter" or the basic physical elements such as "metal, wood, plastic, fiber from which the whole or the greater part of something physical is made," *Webster's New Third Int'l Dictionary* 1392 (1963), and "matter" usually is "something written or printed." *Id.* at 1394.

On the other hand, "material" may also refer to intangibles such as ideas, perceptions, observations or "data that may be worked into a more finished form." *Id.* at 1392. Moreover, even though the phrase "other informational materials" follows a list made exclusively of items communicating information in a tangible form such as books and tapes, the traditional rule of statutory construction that words in a list should be given a similar or related meaning, *see Dole v. United Steelworkers,* —— U.S. ——, 110 S.Ct. 929, 935, 108 L.Ed.2d 23 (1990), is not dispositive here because the phrase "informational materials" is set off by the disjunctive "or" revealing a congressional intent to broaden, not limit, the preceding class. *See FCC v. Pacifica Found.,* 438 U.S. 726, 739–40, 98 S.Ct. 3026, 3035–36, 57 L.Ed.2d 1073 (1978); *cf. United States v. Powell,* 423 U.S. 87, 90, 96 S.Ct. 316, 318, 46 L.Ed.2d 228 (1975).[8]

Furthermore, the relatively meager legislative history that exists does not clarify the meaning of the phrase "other informational materials." *Accord Walsh v. Brady,* 729 F.Supp. 118, 119 (D.D.C.1989). In fact, there is no mention of any distinction between tangible and intangible information anywhere in the legislative history, *see* P's Memo at 19, and even though the legislative history reflects, at best, a general purpose to foster the exchange of ideas across national borders, there is no discussion of the limits, if any, on that legislative objective.[9]

---

6. For the purposes of this discussion, the Court assumes without deciding that coverage of sports is entitled to full First Amendment protection.

7. Of course, while the term "information" may relate to and be expressed in intangible forms, *i.e.,* speech, the Court must analyze the entire statute or phrase in question and not a single word in isolation.

8. Plaintiff's argument that intangibles are exempt from regulation because the Berman Amendment does not permit the restriction of "informational materials" other than those which fall within the scope of two "national security" statutes, *see* Plaintiff's Memorandum of Law ("P's Memo") at 14–15, assumes that the precise issue to be resolved, *i.e.,* whether intangibles are encompassed within the phrase "informational materials," has already been resolved in its favor.

Furthermore, contrary to ABC's assertion that other statutes use the phrase "informational materials" to encompass telecommunications, *see* P's Memo at 16, three of the statutes relied upon are not any clearer on the issue presented than the Berman Amendment. *See* 7 U.S.C. § 22(a)(2) (1988); 20 U.S.C.A. § 3192(a)(3) (West 1990); 22 U.S.C.A. § 5202(1) (West 1990). Moreover, the plain language of the other statute relied upon if anything supports defendant's contentions in that it reflects that when Congress intends that "informational materials" include telecommunications, it expressly does so. *See* 47 U.S.C. § 397(14) (1982) ("informational materials *that may be transmitted by means of electronic communications*") (emphasis added).

9. For example, Senator Mathias, a sponsor of the predecessor to the Berman Amendment, stated that his proposed amendment embodied the ideal of free exchange of ideas across national borders and that certain prohibitions ex-

For example, although the Report of the Committee on Foreign Affairs of the House of Representatives ("Report") states that the Berman Amendment "codif[ies] current practice ... in the recent embargoes of trade with Nicaragua and Libya, of exempting informational materials and publications from import restrictions," H.R. No. 40, 100th Cong., 1st Sess., pt. 3, at 113 (1987), the Nicaraguan and Libyan embargoes do not on their face purport to deal with agreements for exclusive broadcasting rights.[10] Nor has the Court been directed to any agency practice or experience thereunder permitting a royalty payment of the type at issue here.[11]

The Court therefore concludes that since neither the Berman Amendment nor its legislative history is so clear as to make judicial deference inappropriate, the Court must defer to the OFAC's interpretation, unless, as ABC contends, such deference is precluded by the First Amendment, or unless those Regulations as construed by the agency are so arbitrary and irrational as to violate substantive due process.[12] For the reasons that follow, the Court rejects ABC's contention that deference under the circumstances presented here would be unconstitutional.

■ ABC's First Amendment arguments are predicated principally upon the assumption that the congressional or executive power to regulate speech when dealing with foreign affairs is subject to the same scrutiny and limitations that the First Amendment would impose in the domestic context. However, as the decision of the Second Circuit in *Teague v. Regional Commissioner of Customs*, 404 F.2d 441 (2d Cir.1968), *cert. denied*, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969), makes

---

isting under the TWEA and various immigration laws made little sense in light of the impact that telecommunications has on modern society. *See* 132 Cong.Rec. 6551 (1986). However, the Senator's comments do not contain a definition of "informational materials." Moreover, Senator Mathias also stated that abstract ideals contained in the First Amendment are "articulated in tangible forms." *Id.* at 6550.

Nor does a Report of the Committee on Foreign Affairs of the House of Representatives, incorporated into the legislative history of the Berman Amendment, which noted that the American Bar Association House of Delegates advocated that the importation of "informational materials" should receive similar First Amendment protection as would be provided in the domestic context, support plaintiff's contentions. *See* H.R.Rep. No. 40, 100th Cong., 1st Sess., pt. 3, at 113 (1987). That Report does not explicitly adopt or reject the ABA's position and does not define the phrase "informational materials."

Amici Curiae, CBS, Inc. and the National Broadcasting Company, Inc. ("Amici"), cite a letter written by Congressman Berman, the sponsor of the Berman Amendment, to the OFAC urging the OFAC to reconsider its decision vis-a-vis ABC because telecommunications fall within the scope of the Berman Amendment. *See* Brief of Amici at Ex. A. Such post-enactment evidence is entitled to little or no weight, *see County of Washington v. Gunther*, 452 U.S. 161, 176 n. 16, 101 S.Ct. 2242, 2251 n. 16, 68 L.Ed.2d 751 (1981), especially since the statement involved was made after the present controversy arose.

10. In fact, both embargoes have exemptions similar to those presently contained in the Cuban Regulations. *See* 31 C.F.R. § 540.536 (Nicaragua) (authorizing the importation of "publica-

tions, including books, newspapers, magazines, films, phonograph records, tape recordings, photographs, microfilm, microfiche, posters and similar materials"); 31 C.F.R. 540.536 (Libya) ("publications and materials imported for news publication or news broadcast dissemination"). Moreover, although ABC claims that royalty payments have been permitted under these embargoes, there is no evidence establishing that such royalty payments were in fact made with the knowing acquiescence of the OFAC.

11. Although ABC asserts that the OFAC has issued specific licenses for the purchase of broadcasting rights to sporting events in Cuba, *see* P's Memo at 9; Solomon Decl. at ¶ 7, it has presented no evidence to support this proposition and, indeed, it appears that licenses were granted to cover these Cuban events on the express condition that no rights payments be made to Cuba. *See* Declaration of Marilyn L. Muench (annexed to Defendant's Supplemental Brief in Response to Plaintiff's Rebuttal Evidence as Ex. 2) at ¶ 6.

12. It should be noted that the applicability of concepts of substantive due process to the exercise of the Executive's power in foreign affairs is not entirely clear, and the Court has been cited to no persuasive or dispositive authority on this issue. However, the Court will assume for purposes of its analysis that there are limits of rationality that cannot be exceeded in that area as well, *see Richardson v. Simon*, 560 F.2d 500, 504–06 (2d Cir.1977), *appeal dismissed*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 536 (1978), where concedely the Executive exercises the broadest possible discretion. *See Wald, supra*, 468 U.S. at 242, 104 S.Ct. at 3038.

clear, that is most assuredly not the case. In *Teague,* the Second Circuit upheld the constitutionality of the Cuban embargo although it entirely prohibited the importation of all "informational materials," which is now permitted by the Berman Amendment. The restrictions upheld in *Teague* would have been clearly constitutionally invalid in a domestic context.

Moreover, even in the domestic context, the Supreme Court has recognized that the First Amendment must be flexibly applied depending upon the nature of the regulation imposed, the type of speech at issue, the context in which the regulation arises, and the purpose for which the regulation is imposed. *See Ward v. Rock Against Racism,* —— U.S. ——, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989); *Red Lion Broadcasting v. FCC,* 395 U.S. 367, 387–90, 89 S.Ct. 1794, 1805–07, 23 L.Ed.2d 371 (1969); *Teague, supra,* 404 F.2d at 446.

Therefore, it is far from clear that the OFAC's construction of the Berman Amendment in this case violates the First Amendment. Moreover, the cases relied upon by ABC, *see DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const.,* 485 U.S. 568, 575–76, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988); *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 499–500, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979), have no relevance to the exercise of the Executive's authority to conduct foreign affairs and, thus, do not support ABC's broad proposition that deference here would violate the First Amendment.

This conclusion is further supported by the circumstance that substantial constitutional issues of separation of powers and the authority of the Executive to conduct foreign affairs would be raised by an overly expansive interpretation of the Berman Amendment. As plaintiff concedes, *see* Plaintiff's Supplemental Memorandum at 3, the Berman Amendment is in derogation of the Executive's constitutional authority to conduct foreign affairs by the use of embargoes on trade with hostile nations, a power found constitutionally valid in *Teague.* Although the government has not

challenged the constitutionality of that limitation in this case, the Court must nevertheless be careful to balance the First Amendment constitutional issues that could arise from deference to the agency's interpretation against those constitutional issues which may arise if insufficient latitude is given to the Executive in the conduct of foreign affairs.

██ In addition, the Court is not persuaded by ABC's claim that the Regulations impermissibly discriminate between the print and broadcast media. By precluding payments for exclusive television rights to the Games, the OFAC has not denied ABC a benefit enjoyed by any newspaper or magazine. ABC does not contend, and has not established, that the OFAC has permitted anyone, including the printed media, to pay the Cuban Government for the right to exclusively cover the Games. Moreover, both newspapers and broadcasters have the same right to obtain those games in tangible form, *e.g.* videotapes, and to use them in any way that they wish upon the payment of appropriate royalties after they have been produced. Furthermore, coverage of the Games on a non-exclusive basis will be permitted by the OFAC for all types of media so long as royalty payments are not made to the Cuban Government.

ABC's reliance on cases like *Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) and *The Florida Star v. B.J.F.,* —— U.S. ——, 109 S.Ct. 2603, 2613, 105 L.Ed.2d 443 (1989) is misplaced. Those cases involved content-based restrictions imposed upon one type of media that were not imposed on others. Since those content-based discriminations were not supported by a compelling state interest, they were invalidated. No such content-based discriminatory restrictions are contained in the Regulations at issue. *See Ward, supra,* 109 S.Ct. at 2754 (regulations are content-neutral if application does not depend on disagreement with message conveyed and serves purposes unrelated to the suppression of speech) [13]; *Teague, su-*

---

**13.** The interests advanced by the Regulations 

are (1) to limit funds which Cuba may use to

**1014**

pra, 404 F.2d at 445.[14] Likewise, in *Lakewood v. Plain Dealer Publ. Co.*, 486 U.S. 750, 759, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988), the Court struck down a local ordinance empowering the mayor, in his discretion, to grant permits for the placement of newspaper racks on public property because the ordinance created the substantial danger that the government official may discriminate against certain speakers because of the content or viewpoint of the newspaper. Here, there has been no showing of such discrimination.

■ ABC also argues that the Regulations are irrational and arbitrary in that they do not serve the interests of preventing the payment of substantial sums to Cuba because the Regulations permit royalty payments for works in existence but prohibit royalty payments for works not yet in being. *See* P's Memo at 34; Transcript at 63. However, "[m]atters relating to the conduct of foreign relations ... are so exclusively entrusted to the political branches as to be largely immune from judicial inquiry or interference." *Wald, supra*, 468 U.S. at 242, 104 S.Ct. at 3038 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952)); *Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981); *United States v. Curtiss Wright Export Corp.*, 299 U.S. 304, 319–20, 57 S.Ct. 216, 220–21, 81 L.Ed. 255 (1936). Therefore, the Court's inquiry into the wisdom of executive action must end if the Executive has advanced a "facially legitimate and bona fide reason" for the distinction made. *See Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972). Tested by that standard, the Court cannot say that it was irrational for the OFAC to conclude that payments of the type at issue here presented a greater potential for assisting a hostile foreign government than payments for tangible informational materials already in being.

■ Lastly, ABC contends that the proposed transaction is authorized pursuant to the general licensing provision for news gathering activities, *see* 31 C.F.R. § 515.560(a)(1)(ii)[15], and that therefore the OFAC has misapplied its own regulations. *See* P's Memo at 27–31. However, an agency's interpretation of its own regulations is entitled to controlling weight unless that interpretation is contrary to the plain language of the regulations. *See INS v. Stanisic*, 395 U.S. 62, 72, 89 S.Ct. 1519, 1525, 23 L.Ed.2d 101 (1969). The OFAC's determination that a broadcasting rights agreement does not fall within the news gathering license is not contrary to the general licensing provision in question especially since that regulation does not on its face deal with such agreements, but merely authorizes transactions incident to travel to Cuba for news gathering purposes. Moreover, the OFAC's construction of that provision is supported by and consistent with other regulations that expressly exclude telecommunication transmissions from the scope of "informational materials," *see* 31 C.F.R. at § 515.332(b)(2); prohibit payment of royalties for works not yet in being, *see id.* at §§ 515.206(c), 515.-

---

promote activities inimical to the United States' interests; (2) to use blocked funds for leverage in negotiations with the Cuban Government; and (3) to retain control over blocked funds for possible use or vesting in settlement of American claims. *See De Cuellar, supra*, 881 F.2d at 1569; *Yih–Chun v. Federal Reserve Bank*, 442 F.2d 460 (2d Cir.1971); *see also Wald, supra*, 468 U.S. at 243, 104 S.Ct. at 3038.

14. ABC and the Amici argue that *Teague* is distinguishable from the present case because there was no discrimination in *Teague*. In fact, however, the Second Circuit upheld the Regulations even though educational institutions were exempted from the prohibition "without restriction as to the amount paid" for the imports and

stated that this exemption "did not justify an attack on the basic regulation." *See Teague, supra*, 404 F.2d at 446 n. 6.

15. ABC also cites provisions of the Regulations that were withdrawn by the OFAC when it amended the Regulations to comply with the Berman Amendment. *See* 31 C.F.R. § 515.546(a) (1988) (authorizing the purchase of "news material" for domestic news publication or news broadcast dissemination); 31 C.F.R. § 515.560(e) (1988) (authorizing the non-commercial importation of "publications" by newspersons). These provisions do not add support to ABC's position because they are not substantially different from the present Regulations.

545(b); and prohibit agreements for the purchase of television rights. *Id.* at § 515.565(c)(1). For similar reasons, the Court also rejects ABC's suggestion and Amici's claim that the Regulations are void for vagueness.

In sum, the Court concludes that the Regulations are not contrary to the Berman Amendment and that the Berman Amendment as construed is constitutional.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. The Complaint is dismissed and the Clerk shall enter judgment for the defendant and close the above-captioned action.

It is SO ORDERED.