# The President's Authority to Take Certain Actions Relating to Communications from Iran

The President has statutory and constitutional authority, subject to First Amendment limitations, to limit or embargo altogether video or audio communications from Iran which aggravate the present crisis, either unilaterally or in compliance with United Nations Security Council sanctions.

The First Amendment requires that any action taken to limit communications from Iran be narrowly tailored and sweep no more broadly than the underlying justification requires. A restriction that severs all communications links with Iran would be subject to less exacting First Amendment scrutiny than a more limited restriction based in whole or in part on the contents of the communication.

December 27, 1979

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

You have asked us to provide an overview of the legal issues raised by executive action, either unilaterally or in compliance with United Nations Security Council sanctions, that would have the effect of prohibiting importation of certain types of television messages or transmissions from Iran. Specifically, the action would address video messages that aggravate the hostage situation by creating in the minds of the captors the impression that they have a vehicle for manipulating public opinion in this country. These video messages might include statements by the Ayatollah Khomeini, messages from the student captors, or tapes of mob demonstrations in front of the American Embassy in Tehran. We consider first the President's statutory and constitutional authority to proceed with and without a Security Council resolution. We then outline the First Amendment limits on that authority.

## I. Authority

Article 41 of the United Nations Charter gives the Security Council authority to "decide what measures not involving the use of armed force are to be employed to give effect to its decisions." The range of measures appears to be quite broad, and may "include complete or partial interruption of economic relations and of rail, sea, air, postal, telegraphic, radio, and other means of communication, and the severance of diplomatic relations." Therefore, Article 41 can be construed to include an international news embargo: a complete or selective restriction of news transmitted—either directly or indirectly—from a particu-

153

lar country. It would at the very least include severance of the means of transmission that link the embargoed country with the outside world, *e.g.,* microwave transmission links.

Under 22 U.S.C. § 287c, the President by executive order may implement a Security Council resolution and, to that end,

> . . . investigate, regulate or prohibit, in whole or in part, economic relations or rail, sea, air, postal, telegraphic, radio, and other means of communication between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof, or involving any property subject to the jurisdiction of the United States.

We think that this provision does constitute a broad grant of authority by Congress to the President. Subject to First Amendment limitations, it would appear to empower him to prevent importation of video or audio messages from Iran, certain leaders of that nation, or particular citizens within that nation, and thereby prevent their display to the American people via radio and television. Section 287c(b) states that anyone convicted of violating such an executive order would be subject to a fine of not more than $10,000 and imprisonment of not more than 10 years. In the event of violation by a corporation, § 287c provides for the fining and imprisonment of officers, directors, and agents of the corporation and the seizure of corporate property involved in the violation. (There is no injunctive provision in the statute.)

Should the President wish to impose a message embargo unilaterally, *i.e.,* without the benefit of a Security Council resolution, other sources of statutory and constitutional authority are arguably available to him.

1. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701–06 (Supp. I 1977), affords the President the authority in a national emergency to

> . . . investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest; by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B). That authority is subject to the significant proviso that it does not include "the authority to regulate or prohibit directly or indirectly any postal, telegraphic, telephonic, or other per-

sonal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b).

Because of this proviso we think there are some restrictions directed toward communications that are not within the terms of the IEEPA. We think that the Act could properly be invoked to limit the use of Iranian facilities by American networks including the use of broadcasting studios, transmission lines, and local film crews. In short, the economic dimension of news broadcasting could be directly regulated. But it probably does not afford authority to regulate the communications dimension *per se.* On this distinction between economic and noneconomic considerations, two statements in the pertinent House committee report are worth review:

> As a further substantive constraint, the scope of the authorities should be clearly limited to the regulation of international economic transactions. Therefore the bill does not include authorities more appropriately lodged in other legislation, such as authority to regulate purely domestic transactions or to respond to purely domestic circumstances, or authority to control *noneconomic* aspects of international intercourse such as personal communications or humanitarian contributions.

H. Rep. No. 459, 95th Cong., 1st Sess. 10-11 (1977). The report goes on to state:

> [W]hile it should be the purpose of the legislation to authorize tight controls in time of national emergency, these controls should not extend to the total isolation of the people of the United States from the people of any other country. Such isolation is not only unwise from a foreign policy standpoint, but enforcement of such isolation can also entail violation of First Amendment rights of freedom of expression if it includes, for example, prohibitions on exchange of printed matter, or on humanitarian contributions as an expression of religious convictions.

*Id.* at 11.

2. A second, and probably the best, source of statutory authority is 22 U.S.C. § 1732. It provides:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall

155

forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

This provision was passed by Congress in 1868 and has never been utilized. It is striking both in the breadth of the authority it confers and in its apparent textual appropriateness for the present situation. We think that this section can plausibly be read to authorize the President to take all actions—short of acts of war and consistent with specific constitutional prohibitions—necessary to obtain the release of the hostages.

3. The President arguably has statutory authority to prevent the use of COMSAT satellites for the broadcast of inflammatory newsreels from Iran. Section 721 of Title 47 of the United States Code gives the President authority to

(4) exercise such supervision over relationships of [COMSAT] with foreign governments or entities or with international bodies as may be appropriate to assure that such relationships shall be consistent with the national interest and foreign policy of the United States.

The problem with relying on this section in the proposed fashion is that the President is not attempting to regulate the relationship of COMSAT with a foreign nation, but with American corporations that are attempting to transmit information about that nation. While we have not had time as yet to study the application of this statute, we are unaware of any occasion on which this power has been utilized.

4. Finally, there is an argument that the President has the inherent constitutional authority to take the proposed action on the basis of his plenary role in foreign affairs. *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). That is, in the absence of an express limitation on his authority by Congress, the President can take all action necessary to protect American nationals overseas, unless again these actions violate specific constitutional restrictions. Analysis would proceed along the lines of Mr. Justice Jackson's concurrence in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 635–38 (1952). An argument similar to the one we have presented to the D.C. Circuit in the Iranian student deportation case could be made. The President's power, we could contend, is at its greatest in this arena because he has considerable and well recognized constitutional powers in the foreign affairs area, and those powers have been augmented by Congress'

156

delegation to the President of all the power the legislature possesses to respond to acts by foreign powers that deprive Americans of their liberty (i.e., the 1868 untested statute). Even without relying on that particular statutory delegation, we could argue that the President is moving into Mr. Justice Jackson's "zone of twilight" where exigency demands that the constitutional scheme permit prompt executive action, although a similar restriction would be within the legislative power of Congress. It should be noted that a potential response to this argument is that by passing the IEEPA, Congress has defined the express manner by which the President is to impose nonmilitary sanctions on a foreign government.

In considering which "authority" base to assert, it will be important to weigh the fact that under both the U.N. sanction alternative and under IEEPA a criminal sanction is readily available. Absent reliance on ill-fitting espionage laws, there are no criminal sanctions for failures to comply with actions based on the President's constitutional powers or on the 1868 statute.

## II. First Amendment

Regardless whether the President relies on a Security Council resolution or some other basis for the proposed action, he still is bound by First Amendment limitations. It is clear that U.S. treaty obligations are subject to constitutional scrutiny and, specifically, First Amendment scrutiny. *Reid* v. *Covert,* 354 U.S. 1 (1957). The First Amendment protects the rights of Americans to receive information and ideas, including those from abroad. *Kleindienst* v. *Mandel,* 408 U.S. 753, 762–63 (1972).

The nature of First Amendment scrutiny will depend upon the type of restriction imposed by Security Council or independent executive action. The proposed action might simply consist of a ban on certain specified types of television broadcasts. Transmission of the broadcast despite the ban could subject the network to criminal sanctions, but there would be no prior restraint. Alternatively, the President might institute a licensing scheme whereby all broadcasts of a particular class must be cleared by federal authorities before they can be broadcast domestically. This is a classic prior restraint and subject to more exacting scrutiny.

Whether seen as a prior restraint or as a less severe form of action, the government—as a minimum—must put forward a "compelling interest" in order to justify the restriction. Moreover, there must be a close nexus between the proposed restriction and the purported interest, *e.g., Police Department of the City of Chicago* v. *Mosely,* 408 U.S. 92, 95–96 (1972), and the action taken must be narrowly tailored and may sweep no more broadly than the underlying justification requires. The justification in this case might be that the Iranian government's and the

157

captors' ability to gain access to American television prolongs the captivity of the hostages by affording the abductors a stage that they are unwilling to yield, and that if they are denied the organs of publicity, the rationale for holding the hostages will dissipate, resulting in their release.

This characterization of the United States' interest necessarily prompts a subsidiary question. Precisely what communications prolong the crisis? If the proposed restrictions are too narrow, thus permitting effective publication of Iranian grievances in some form, it can be argued that the United States does not have a compelling interest in the restriction actually imposed because it does not materially advance the stated government interest. If, on the other hand, the restriction is stated broadly, such as a ban on all display of film generated in Iran, the restriction will be subject to the argument that it is overbroad, particularly if the print media could continue to use pictures from Iran. Any restriction must have a clearly defined purpose and an intelligible scope in light of that purpose if there is to be any chance of passing judicial scrutiny.

Of course, an even more demanding standard would apply if the action includes a licensing system whereby the Executive would pass on telecasts before they are transmitted to the American public. As the Supreme Court has repeatedly stated, any "system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times Co.* v. *United States,* 403 U.S. 713, 714 (1971). Whatever the justification here, we would have a difficult time demonstrating the sort of direct, immediate and irreparable harm required to withstand this most exacting form of scrutiny. The cases, as confirmed by our experience with the Iranian student demonstrations, do however suggest two guiding considerations: (1) a court is likely to accord substantial deference to the factual assertions and educated, albeit speculative, judgments of the President's foreign affairs experts; and (2) our chances of success may turn significantly on the extent to which we can demonstrate to a court that the action taken is finely tuned and narrow. Indeed, the few cases that are close to being on point suggest that we would improve the likelihood of success if we can claim that the regulation here affects only time, place, or manner and is not designed to stifle the flow of ideas of information.

We note that the communications embargo could take a third form that might raise less troublesome First Amendment problems but which would probably have limited practical effect. That would be a restriction that simply severs all telegraphic, telephonic, postal, communications satellite, and microwave links with Iran. This would not be a content-based measure and would be subject to less exacting First Amendment scrutiny as a result. It could be justified as another step in the effort to isolate Iran politically and economically from the rest of

the world. As a practical measure, we do not think, however, such a restriction would prove useful. American networks could continue to gather film in Tehran and transmit it to the United States from facilities outside Iran. It would probably have only a temporary disruptive effect on the ability of the abductors to command international and American forums.

It was this type of incidental restriction on First Amendment communication that this Office addressed in 1977, when at issue was a proposed executive order prohibiting the use or transfer of any funds within the United States for the purpose of maintaining in this country an office or agent of the government of Rhodesia. This order was intended to implement U.N. Resolution 409. Since one effect of the order would be the closing of the Rhodesian Information Office in the United States, it was argued by opponents of the order that the necessary consequence would be to reduce unconstitutionally the flow of ideas in this country. We advised that since the impact on the Information Office was merely incidental to this Government's legitimate interest in joining the U.N. effort to effect the diplomatic and economic isolation of Rhodesia, the order withstood First Amendment scrutiny. It was not an attempt to restrict communication *per se. See, e.g., Veterans and Reservists for Peace in Vietnam* v. *Regional Commissioner*, 459 F.2d 676 (3d Cir.), *cert. denied*, 409 U.S. 933 (1972) (Trading with the Enemy Act restriction on unauthorized dealings in merchandise constitutional although literature within definition of merchandise).

### III. Conclusion

Our thoughts here are necessarily preliminary, and we will continue to consider these issues as well as the more long-range question of the possible effects of any action touching these types of communications. Our assessment at this stage, however, is, first, that an acceptable authority base for action either through the United Nations or unilaterally can be found and that, second, any action we can hypothesize carries with it significant First Amendment problems.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*
