**AMERICAN DOCUMENTARY FILMS, INC., et al., Plaintiffs,**

v.

**SECRETARY OF the TREASURY OF the UNITED STATES, et al., Defendants.**

**No. 72 Civ. 1711.**

United States District Court, S. D. New York.

July 5, 1972.

Rabinowitz, Boudin & Standard, New York City, for plaintiffs by Michael B. Standard, K. Randlett Walster, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants by Samuel J. Wilson, New York City, of counsel.

GURFEIN, District Judge.

The plaintiff, American Documentary Films, Inc. (ADF), is a corporation organized under the Membership Corporation Law (now the Not-for-Profit Corporation Law) of the State of New York in July 1969.[1] Its principal purpose is to act as a distributor of films, and it describes itself as building an alternative to commercial mass media. As an implementation of that purpose it has from time to time over the past several years transported into the United States and exhibited films made in many countries, including North and South Vietnam and Cuba.

According to the plaintiff, in about July or August 1971, an officer of ADF named Michael Myerson discussed with the Cuban Film Institute in Havana the possibility of a series of festivals in the United States of films produced and directed by Cubans in Cuba. The Cuban Film Institute spokesman for the film-makers agreed to the festivals and suggested that prints of a number of films were then located in Canada. Thereafter, in August or September and again in November 1971, the ADF officer brought into the United States a number of films of Cuban origin, crossing the border between the United States and Canada and making no customs declaration. In the period between November 1971 and March 1972 elaborate promotional and exhibition activities were undertaken in the New York area in anticipation of the opening of the first of the festivals at the Olympia Theatre in New York on March 24, 1972.

Apparently the Foreign Assets Control section of the Federal Reserve Bank learned of the extensive promotional activities being conducted respecting these films. On March 6, 1972, on orders from Washington, a special representative of the Office of Foreign Assets Control visited the premises of ADF and made inquiry concerning the origin of the films, that is, how the films were brought into the United States and how any payment therefor was effected. Mr. Myerson refused to supply any information until he could consult with his attorney. The next interview was on March 20, 1972 when Mr. Myerson, in the presence of an attorney, stated that the Cuban origin films had been listed in an application for a Treasury license which was filed March 17 and which contained the entire list of Cuban films that had been imported by ADF. He conceded that on two occasions in September and November 1971 the films had been imported by him from Canada in the trunk of his car, and that no customs declaration of entry for such films had been made on either occasion. It appears that the day before the license application was made ADF had been advised by its present firm of attorneys that, since the films had a Cuban source of origin, the license was required. In the application for the license the applicant stated that no financial consideration, direct or indirect, had gone or was to go to a designated national.

Subsequent to Myerson's admission that he had brought the films into the United States without a declaration of entry or the payment of duty, the Foreign Assets Control wrote the plaintiff a letter on March 22, 1972, requesting "1. all exchanges of correspondence and other documents with the Cuban and Canadian parties relating to the films in question; 2. names and addresses of the Canadian party or parties from whom the films were obtained." At the March 20 meeting with the special representative of the Office of Foreign Assets Control, Mr. Myerson had refused to disclose the name and address of the party or parties in Canada from whom

1. Co-plaintiffs are three American citizens who desire to see films from Cuba. When "plaintiff" is referred to in the singular, it means ADF.

the films had been obtained. On March 23 a customs special agent and the special representative of the Foreign Assets Control visited the premises of ADF and requested that the films be turned over. This request was refused.

In the meantime, the film festival of Cuban films was scheduled to begin at the Olympia Theatre on March 24, 1972. On that day, the office of the United States Attorney requested the names of the Canadian parties and this information was again refused. The following day, on March 25, search warrants were obtained for the premises of ADF and of the Olympia Theatre. No films were seized, however, except one film which was in the possession of Jerrold Stoll, President of ADF. Several days later, on March 28, two administrative orders issued by the Acting Director of the Office of Foreign Assets Control were served on ADF, requiring it to make available for examination certain of its books and records and to appear and furnish information regarding films of Cuban origin imported, transported or offered for sale or rental since May 1, 1970. The President of the company appeared subsequently and refused to answer questions; but at that visit of April 5, 1972 he and his attorney did present on behalf of ADF some documents for examination, among which was a piece of paper bearing the handwritten notation: "Goes to highest bidder in city. Canadian—no mention of Embassy, just say we haven't permission. No individual film rentals. Must be a package—we're not the distributor of the film—we're just responsible for tour of the festival." There were also produced several invoices purportedly showing that at least two of the films allegedly imported in September and November 1971 were actually in ADF's possession as early as May or June 1971.

In a letter of May 4, 1972 plaintiff was advised by the Federal Reserve Bank of New York that its application for a license had been denied by the Treasury Department, but that it would be reconsidered upon receipt of full and complete answers to the above-quoted questions posed in the letter of March 22, 1972. Plaintiff has still not supplied the information requested.

Counsel for ADF had been informed by the Acting Director of Foreign Assets Control on April 5, 1972 that there had apparently been violations of law in the transaction, and that licenses could not be issued until the investigation was completed and a decision reached on the criminal aspect, even if the Canadian intermediaries' identities were disclosed. That official denies that he ever told anyone that if ADF made full disclosure and if no substantive violations were found he would, nevertheless, refuse a license.

ADF maintains that it had no prior knowledge of any requirement for filing a declaration of entry for films obtained as gifts. The Government counters by stating that in May 1969 David Castro, an agent of ADF, had actually been detained by United States Customs Officials at Champlain, New York and that a film found in his possession, which he had not declared, was seized and subsequently forfeited for customs law violation. The Government infers from this that ADF did know that a customs declaration was required and that it, therefore, knew that it had brought the motion pictures in suit into the United States illegally.

Several films listed on ADF's license application were actually shown in May 1972 at Columbia University under the sponsorship of "Books for Cuba Committee" and the Teachers College Student Senate. Also, on April 18, 1972, ADF filed an application for a license to import posters of Cuban origin. The Office of Foreign Assets Control asked a number of questions designed to assist in clarifying the issue of whether or not there would be any direct or indirect commercial or financial benefit to Cuba from the purported transaction. All of these questions were fully answered by ADF to the satisfaction of Foreign Assets Control. A license authorizing importation of these Cuban posters was is-

sued promptly after Foreign Assets Control received ADF's reply to those inquiries.

## I

On these facts, which are virtually undisputed, plaintiff moves for an injunction pursuant to Fed.R.Civ.P. 65 enjoining the defendants from interfering with the importation or exhibition of these films of Cuban origin, for summary judgment and for a declaratory judgment declaring that 31 C.F.R. §§ 515.101 et seq. and particularly 31 C.F.R. §§ 515.-601, 515.602, 515.801 are unconstitutional on their face and as applied to the plaintiff in that (1) they abridge the right of free speech and press, and act as a prior restraint in violation of the First Amendment of the United States Constitution; (2) they deprive persons of property arbitrarily and without due process of law, contain no ascertainable standards, shift the burden of proof that no crime has been committed and that the regulations have been complied with to the applicant, require self-incrimination, provide no right to a hearing and no review of adverse determinations, all in violation of the due process and self-incrimination clauses of the Fifth Amendment. In addition, the manner of administering the regulations with respect to ADF allegedly violates the equal protection clause incorporated within the due process provision of the Fifth Amendment.

The defendants cross-move for summary judgment.

■ A principal contention of the plaintiff is that free speech is impinged by the actions directed against it by Foreign Assets Control and that the standards are too vague to be consonant with due process. It also asserts that its license application has not been reviewed under the same standards by which others have been licensed, and that, accordingly, the equal protection clause is violated. In short, the plaintiff treats the matter as one of unconstitutional censorship and, moreover, a censorship unfairly administered against it.

The Government, on the other hand, maintains that this is not a censorship question but solely a question of administering the Foreign Assets Control regulations to prevent hard currency from finding its way to Cuba. It asserts that everything it has done is within the ambit of that purpose.

The plaintiff specifically disavows an attack on the constitutionality of the Trading With the Enemy Act [2] and certain of its implementing regulations, or on the Congressional delegation of power, or on the declaration that the United States is in a period of national emergency. These issues are concededly foreclosed. See, e. g., Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949); Veterans and Reservists for Peace in Vietnam v. Regional Commissioner of Customs, 459 F.2d 676 (3 Cir. May 4, 1972); Teague v. Regional Commissioner of Customs, 404 F.2d 441 (2 Cir. 1968, cert. denied, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969); Sardino v. Federal Reserve Bank, 361 F.2d 106 (2 Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966); United States v. Von Clemm, 136 F.2d 968 (2 Cir.), cert. denied, 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459 (1943); Welch v. Kennedy, 319 F.Supp. 945 (D.D.C.1970).

The plaintiff urges, however, that the issue remains whether the regulations and the "arbitrariness" of their implementation constitutionally "suppress free expression where the restriction of First And Fifth Amendment rights are [sic] far greater than the stated congressional purpose."

## II

Congress has empowered the President to prohibit, and to regulate by license or otherwise, all commercial or financial transactions directly or indirectly with Cuba or Cuban nationals. 50 U.S.C.App. § 5(b); 22 U.S.C. §

2. 50 U.S.C.App. § 1 et seq.

2370(a). Pursuant to these statutes, and pursuant to delegated authority, the Treasury Department has issued the Cuban Assets Control Regulations, 31 C.F.R., Part 515.

One of the principal purposes of the embargo is to deny Cuba foreign exchange earnings from direct or indirect sales of its goods and services to the United States. Accordingly, unlicensed importation of all goods of Cuban origin is prohibited. Except when operating under one of the general licenses promulgated from time to time and which are not applicable here, anyone seeking to import Cuban goods requires a specific license. See 31 C.F.R. §§ 515.204; 515.801. Films of Cuban origin are merchandise of Cuban origin and require a specific license.

The Acting Director of the Office of Foreign Assets Control attests, however, that the problem of censorship has been considered, and that it is the policy of his office to avoid any element of censorship in the administration of what are essentially economic measures. In other words, the policy has allegedly been to license the importation of publications and films from Cuba without regard to their contents if the Office is satisfied that no direct or indirect benefit will accrue to Cuba from the transaction,[3] or that the national interest requires a license to be issued despite the financial benefit to Cuba. Thus, specific licenses are issued in four categories of cases. First, all publications and films are licensed, without regard to content, for commercial importation if the importer deposits all funds due to Cuba for the publications into blocked accounts in domestic banks. The single commercial application yet made for such a license to import publications from Cuba has been granted. Second, publications and films are licensed without regard to method of payment under programs approved by the Library of Congress or the National Science Foundation. Third, publications and films are licensed in exchange for publications from the United States. And fourth, publications and films are licensed when the Office of Foreign Assets Control is satisfied that they are bona fide gifts to the importers without any direct or indirect financial benefit to Cuba or its nationals. There is an additional category of newsgathering organizations which may purchase publications from blocked countries in connection with their news activities.

### III

It seems quite clear to me that there is no general attempt by the Government to censor publications and films of foreign origin by means of the above-described regulatory scheme. In view of that rather obvious finding one must inquire why, if the plaintiff was indeed singled out for special censorship, that was done.

The Government has a simple answer. The application for the license to import the films was made by the plaintiff only after the films had already been imported without a license and, in fact, only after the Government had made inquiry about the importation. While the plaintiff claims it failed to get an import license and to make a customs declaration because it honestly believed that gifts were exempt from the licensing requirement, the Treasury Department claims that it was, nonetheless, entitled to know

---

3. 31 C.F.R. § 500.204, Appendix, item 108 —while it specifically relates to "publications and films from China, North Korea and North Vietnam"—is said to express the policy followed under the Cuban Assets Control Regulations, although no specific Federal Register publication has been made for Cuba. A relevant portion of the foregoing is: "such publications and films are licensed when the Office of Foreign Assets Control is satisfied that they are bona fide gifts to the importers and that there is not and has not been since the effective date any direct or indirect financial or commercial benefit to designated countries or nationals thereof from the importations."

whether funds had been or would be paid to Cuba directly or indirectly.[4]

The issue is whether Foreign Assets Control acted reasonably in requiring an answer to the question of the source of the films and whether the question cast an unfair burden on the plaintiff. The plaintiff still refuses to disclose the identities of the persons residing in Canada from whom it allegedly obtained the films. The inferences deriving from the plaintiff's position are either that the Government must accept the answer that the films were a gift without further investigation or that the question is irrelevant to the statutory purpose. Neither inference can stand analysis.

The question of the identity of the Canadians was relevant because the Treasury had the right to suspect that, because the films were imported without a declaration and because of other circumstances, they came into the United States in some other way than later explained, and that this may have involved payment of dollars for the benefit of Cuba.[5] If the Canadians exist, they might divulge a transaction different from the version of gift given by the plaintiff. If an indirect method of payment to Cuba through Canada existed, the disclosure probably would aid the inquiry. Without going into more detail, it is clear that the Government could be probing beneath the surface for quite proper purposes of enforcement without regard to whether the merchandise involved was motion picture film or some other commodity invested with absolutely no First Amendment aura.

The plaintiff is really arguing its First Amendment claim on the basis of a purely hypothetical case. It assumes that the facts simply indicate that an application for a license to import films from Cuba is made, that the applicant states they are a gift, with nothing more in the background, that the films have not yet been imported, the proposed transaction is disclosed and the source revealed. In such case it may be, as the Court of Appeals for the Third Circuit noted recently, that the license would have to be granted "unless the Office of Foreign Assets Control possessed contrary information from another source." Veterans and Reservists for Peace in Vietnam v. Regional Commissioner of Customs, *supra*. Otherwise the power to deny the license might be deemed an arbitrary mode of impinging on First Amendment rights.

But the hypothetical case supposed is not the case here. This was not a routine, prospective application for importation. Granted the importance of the First Amendment right, the Government still had sufficient ground for suspecting and investigating the answer given in the light of ADF's refusal to elaborate.

The plaintiff claims that "due process" prohibits the shifting of the burden of disclosure to the applicant for the license. The contention, on these facts, is unsound. The Treasury has no knowledge of the key questions of origin or payment when application for a license is made. If these disclosures are legitimately required, and they are, since otherwise there would be no information at all upon which to weigh the request for a license, then the specific source must similarly be disclosed. The plaintiff's position that the Government must accept its answer whatever it be, in every

---

4. While it is not dispositive of the result, the Court considers that the earlier seizure from David Castro, an ADF officer, probably alerted ADF to the law requiring a declaration of Cuban films at the Canadian border. But since this kind of factual issue should not, without evidentiary proof of all the circumstances, invoke the doctrine that the plaintiff should be denied relief in equity because of "unclean hands," as the Government contends, that doctrine will not serve as a ground for decision in this case.

5. The reference to "Embassy" in the memorandum obtained by the Government opens the possibility at least that the transaction could have been with or through an Embassy.

case, is to say that applications for licenses may not be investigated at all. Such a doctrine would surely put a premium on perjury, and a premium so high as to be intolerable even in the light of First Amendment values. The right of the Treasury to elicit further facts must be decided case by case.

■■ We have been instructed that on a First Amendment claim we must seek "the purpose" of the regulations. If the restriction of First Amendment freedoms is only incidental to the proper general purpose of the regulations (restricting the dollar flow to hostile nations) and not unnecessarily broad, then the regulations do not violate the First Amendment. Teague v. Regional Commissioner of Customs, *supra*, 404 F.2d at 445. Moreover, in *Teague*, as here, "there is no censorship of selected materials; all publications from the specified nations are treated alike." (Id.) We must conclude, therefore, that, as the Supreme Court said in United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), "the governmental interest [here] is unrelated to the suppression of free expression." If there is any infringement of First Amendment freedoms, it is permissible as incidental to the proper and substantial general purpose of the regulations, for there has been no attempt to censor the content of the films; and this incidental restriction is no greater than is essential to the furtherance of the general purpose. Nor has any burden been cast on the plaintiff to justify the protection inherent in First Amendment rights. Cf. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). There is no classic prior restraint, either on the ground of obscenity or political expression.

### IV

■ ADF also contends that by being made to reveal the source of the films its privilege against self-incrimination is being violated. The short answer is that the applicant for the license is a corporation, and a corporation has no such privilege. George Campbell Painting Corp. v. Reid, 392 U.S. 286, 288–289, 88 S.Ct. 1978, 20 L.Ed.2d 1094 (1968). It has, in any event, been decided that requiring answers to questions put by Foreign Assets Control to a prospective licensee would not violate the Fifth Amendment privilege. Teague v. Regional Commissioner of Customs, *supra*, 404 F.2d at 447. See also Toussie v. United States, 397 U.S. 112, 133–134, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970) (White, J., dissenting).

### V

■ Further, the plaintiff contends that it has not been afforded equal protection of the laws in violation of the Fifth Amendment. It asserts that the only difference between itself and those more favorably treated is a "difference in size and status." This indicates that the plaintiff does not assert inequality based on the political beliefs of its members. If the difference in treatment were based on size or status, the plaintiff would have a good point. Cf. Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). But there is no indication that any considerations except the mode of importation and disclosure of the source in relation to foreign exchange control have motivated the authorities. The granting of a license to this very plaintiff for the importation of Cuban posters supports the finding that it is not being treated in a discriminatory fashion.

### VI

The other constitutional objections to the regulatory scheme are found not to be persuasive. Therefore, the motion of the plaintiff for an injunction, summary judgment and a declaratory judgment is denied. On the other hand, since we are concerned with the delicate area of First Amendment rights, the plaintiff should have an opportunity at trial to attempt to establish that the regulations have been enforced against it for ulterior and constitutionally invalid reasons. Ac-

cordingly, the defendants' motion for summary judgment is denied.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

It is so ordered.