# Legality of Certain Nonmilitary Actions Against Iran

Under the International Emergency Economic Powers Act (IEEPA), the President may impose an embargo on all imports from Iran and, subject to certain conditions, a prohibition on exports of food and medicine to Iran. The IEEPA also authorizes him to order the closure of Iranian business offices located in the United States.

While the President may have some statutory and constitutional power to control third party transactions with Iran, particularly those designed to circumvent the impact of sanctions imposed by the United States directly on Iran, his authority to impose a general secondary boycott against those trading with Iran may be limited. It is thus not clear whether, under existing laws and treaties, airlines and shipping companies that serve Iran may be denied landing rights and fuel purchases in the United States.

Presidential action to block international satellite communications from Iran to the United States is clearly authorized only insofar as it is part of a more general ban on transactions with Iran and its nationals.

The President's authority to impose a ban on travel by American citizens to Iran may have a more limited applicability to journalists. *See United States* v. *O'Brien,* 391 U.S.C. 367 (1968). Moreover, restrictions on travel to Iran would have no immediate effect on persons already in that country. However, the IEEPA could be used to impose a broad ban on financial transactions between Americans overseas and Iran or its nationals.

The IEEPA would authorize a broad prohibition against all transactions between Americans relating to Iran, as long as Iran has even an indirect interest in the transaction; however, it is not possible under the IEEPA to reach "purely domestic" transactions.

April 16, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds on an urgent basis to your request for our opinion regarding the legality of ten possible nonmilitary actions against Iran, most or all of which would rely on the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, *et seq.* (Supp. I 1977). We will respond to the proposals in the order in which they have been presented.

### 1. Embargo All Imports From Iran

This action is clearly legal under the IEEPA. The statute explicitly allows the prohibition of transfers in which foreign nationals, as well as

foreign governments, have an interest.[1] The pertinent legislative history envisions total trade embargoes, reflecting well-established practice under the IEEPA's predecessor statute, the Trading With the Enemy Act of 1917. *See* H.R. Rep. No. 459, 95th Cong., 1st Sess. (1977) (hereafter "1977 House Report"); S. Rep. No. 466, 95th Cong., 1st Sess. (1977).[2]

## 2. Prohibit Food and Medicine Exports to Iran

The IEEPA also authorizes this action, although it sounds a note of caution. Under § 1702(b) of the Act,

> (b) The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—
>
> *       *       *       *       *
>
> (2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances.

On its face, this provision applies only to donations, not commercial transactions, and even when applicable may be satisfied by a Presidential "determination" under (b)(2)(A) that it would seriously impair the President's ability to deal with the emergency. It is not clear whether this determination is to be the subject of a report to Congress under § 1703 of the Act, although it could easily be included therein. To give

---

[1] Section 1702(a)(1) reads as follows:

At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

(A) investigate, regulate, or prohibit—
  (i) any transactions in foreign exchange,
  (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
  (iii) the importing or exporting of currency or securities; and
(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest; by any person, or with respect to any property, subject to the jurisdiction of the United States.

[2] The legislative history of the Export Administration Act of 1979, 50 U.S.C. App. § 2401 *et seq.*, confirms that total trade embargoes are to be accomplished under the IEEPA, rather than by export controls. *See* H.R. Conf. Rep. No. 482, 96th Cong., 1st Sess. 46 (1979).

maximum effect to the congressional policy found in § 1702(b)(2), an embargo on commercial food and medicine exports could contain an exception in the terms of the statute to allow donations of these items "to relieve human suffering."

A separate source of authority to control the export of food, but not medicine, is the Export Administration Act of 1979, 50 U.S.C. App. § 2401 *et seq.* To invoke this statute, no executive order is necessary, although there is a requirement for a report to Congress.[3] Under § 6 of the Act, "the President may prohibit or curtail the exportation of any goods . . . to the extent necessary to further significantly the foreign policy of the United States. . . ." Section 6(f), however, provides that § 6 does not authorize export controls on medicine or medical supplies. (At the same time, it explicitly disclaims any effect on authority under the IEEPA to control these goods.)

Restrictions on food exports are authorized but not favored by the Export Act. Section 6(f) provides that it "is the intent of Congress that the President not impose export controls . . . on any goods . . . if he determines that the principal effect of the export . . . would be to help meet basic human needs." And §§ 2(9) and 3(11) urge him to "minimize" restrictions on the export of agricultural products. Of course, grain shipments to the Soviet Union are currently controlled under this statute.

### 3. Close the New York Offices of Iranian Firms

If Iran Air or another Iranian firm is an "instrumentality" or "controlled entity" of the government of Iran, Executive Order No. 12,170 3 C.F.R. 457 (1979), has already "blocked" all "interests" in it. The Treasury Department has issued Iranian Assets Control Regulations, 31 C.F.R. Part 535, which may be broad enough to allow Treasury to order such offices closed without even amending the regulations.[4] Such an interpretation should not run afoul of the statute, which includes authority in § 1702(a)(1)(B) to "prohibit . . . exercising any right, power, or privilege" with respect to subject property. To the extent there is any doubt whether the current regulations authorize ordering businesses to close, an amendment could assert that authority.

---

[3] The substantive and procedural requirements of the pertinent portions of the Export Administration Act are outlined in our memorandum of April 11, 1980, to the Special Assistant to the President for Consumer Affairs. [NOTE:—The cited memorandum is published in this volume at p. 567 *infra.* Ed.]

[4] The operative section of the regulations, § 535.201(a), provides that "no property subject to the jurisdiction of the United States . . . in which . . . Iran has any interest . . . may be transferred . . . or otherwise dealt in except as authorized." The regulations then define "Iran" broadly to include controlled businesses (§ 535.301). "Transfer" is defined broadly enough to include the creation of informal licenses such as those enjoyed by business invitees: "any act or transaction, whether or not evidenced by writing, . . . the . . . effect of which is to create . . . any right . . . privilege, or interest with respect to any property." (§ 535.310) "Interest" is defined to mean "an interest of any nature whatsoever." (§ 535.312)

For those Iranian businesses that are *not* instrumentalities of the government of Iran, an executive order applying the IEEPA to transactions of Iranian nationals could easily have the effect of forcing closure. Indeed, the principal problem here appears to be in avoiding overbroad effects from an order that is designed to reach only some Iranian businesses. For presumably there would be no attempt to block everyday business transactions (such as banking) by Iranian nationals properly present in this country. To avoid undue complexity, an executive order could provide that only firms specifically designated by the Treasury Department would be affected.

### 4. Deny Foreign Airlines That Serve Iran Landing Rights or Fuel Purchases in the United States

This option raises a major unresolved issue under the IEEPA: to what extent may it be used to control foreign countries or nationals that are not the source of the threat that created the emergency? The terms of the statute are broad enough to reach third party conduct, as long as some foreign country or national is involved: § 1702(a)(1)(B) grants the President authority over property in which "any foreign country or a national thereof has any interest." There must also be involved "any person" or "any property" that is subject to the jurisdiction of the United States. Our national jurisdiction is generally held to extend to our citizens, wherever found, and to anyone else found within American territory. *See generally* Restatement (Second), Foreign Relations Law of the United States, § 10 (1965).

These provisions of § 1702(a) suggest the presence of authority to control at least some third country transactions that are subject to our jurisdiction. Such a reading would reflect the obviously broad phraseology of the IEEPA, and would help to forestall simple circumventions of the statute by resort to agency relationships. Moreover, this interpretation would respect a principal limit to presidential discretion imposed by Congress in drafting the IEEPA: denial of authority to regulate "purely domestic" transactions. 1977 House Report, *supra,* at 11.

Nevertheless, persuasive arguments that the IEEPA should be available to control third country transactions that are designed to circumvent its direct impact do not justify regulating other third country transactions as part of a general "secondary boycott." Although the IEEPA and its predecessor statute have long been used to embargo trade with offending nations, we know of no instance of a secondary boycott, nor of any particular support for one in the legislative history. It seems clear, however, that the President could find that a foreign carrier's providing air service to Iran poses an unusual threat to the foreign policy of the United States and that all transactions with that carrier should be prohibited.

It may also be possible for the President to draw authority for an action designed to free the hostages, such as a secondary boycott, from the provisions of an 1868 statute, now 22 U.S.C. § 1732:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

We are unaware of any instances in which this provision has been invoked. It was passed in response to a dispute with Great Britain after the Civil War, in which that nation was trying its former subjects, who had become naturalized Americans, for treason. The House version of the bill, which would have authorized the President to suspend all commerce with the offending nation and to round up its citizens found in this country as hostages, was replaced by the present language which was in the Senate bill. Cong. Globe, 40th Cong., 2d Sess. 4205, 4445–46 (1868). It is not clear whether this change was meant to restrict the President to measures less drastic than those specified in the House bill. It is also not clear what Congress meant by the phrase "not amounting to acts of war." At least Congress did not seem to be attempting to limit the President's constitutional powers.

To the foregoing statutory sources of presidential authority must be added his broad constitutional power in foreign affairs. *See generally United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936). The President should be able to take actions in foreign affairs for which Congress has not explicitly denied him authority. *See Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 579, 635–38 (1952) (Jackson, J., concurring). A secondary boycott against those trading with Iran, ordered to help free the hostages in Tehran, should be within the broad constitutional powers of the President, since the statutes do not explicitly deny him such power—indeed, 22 U.S.C. § 1732 provides him some general support in this particular situation.

There may, however, be limitations on presidential power in applicable aviation agreements with particular countries. The terms by which we grant foreign airlines the right to provide scheduled service here are set out in bilateral agreements with individual countries. We understand

from the State Department that these agreements do not provide for suspension in the present circumstances. (An examination of each bilateral treaty and its amendments would be necessary to verify this for all countries that may be involved. Until that review occurs, we cannot recommend this action.)

The Chicago Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, T.I.A.S. No. 1591, 15 U.N.T.S. 295, 356, includes a provision that in case of war or national emergency the provisions of the Convention "shall not affect the freedom of action" of parties to the Convention (Art. 89). That Convention, however, only gives parties the privilege of making overflights and technical stops for non-scheduled flights. Art. 5. The International Air Services Transit Agreement, Dec. 7, 1944, 59 Stat. 1693, E.A.S. No. 487, 84 U.N.T.S. 389, confers similar privileges for scheduled airlines, and incorporates the provisions of the Chicago Convention (Section 2). The bilateral agreements do not, by their terms, however, incorporate the Chicago Convention provision; they are essentially self-contained agreements.[5]

### 5. Deny Vessels or Companies Serving Iran Access to U.S. Ports or Fueling Facilities

See the analysis above under option 4 for our views on general presidential authority for this. We have not yet had an opportunity to consider the possible effect of the maritime statutes.

### 6. Block International Satellite Communications From Iran to the U.S. at Satellite Ground Stations in the U.S.

The President may have statutory authority to block international satellite communications between Iran and the United States. Under 47 U.S.C. § 721(a), the President is authorized to:

> (4) exercise such supervision over relationships of [COMSAT] with foreign governments or entities or with international bodies as may be appropriate to assure that such relationships shall be consistent with the national interest and foreign policy of the United States.

The purpose of this provision appears to have been to prevent COMSAT from affecting U.S. foreign policy in its contractual arrangements, not to authorize the President to control the substance of its communications. *See* 108 Cong. Rec. 16,603–05 (1962). Thus, the COMSAT statute may provide useful support for an action that is part of a broader foreign policy purpose of severing transactions with Iran.

---

[5] The Joint Statement on International Terrorism at the Bonn Conference may provide some basis for calling on the signatories of the Bonn Conference not to serve Iran because, according to the State Department, Iran is presently harboring two international aircraft hijackers.

It would not support actions directed to the content of particular transmissions.

Section 1702(b) of the IEEPA provides that:

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—
>
>   (1)  any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value. . . .

On its face, this provision goes no further than to deny the President any authority under the IEEPA, without reference to powers he may possess otherwise. The House report emphasizes that it did "not intend . . . to authorize regulation or prohibition of the collection and dissemination of news." 1977 House Report at 15. This reflects an underlying constitutional concern:

> [W]hile it should be the purpose of the legislation to authorize tight controls in time of national emergency, these controls should not extend to the total isolation of the people of the United States from the people of any other country. Such isolation is not only unwise from a foreign policy standpoint, but enforcement of such isolation can also entail violation of First Amendment rights of freedom of expression if it includes, for example, prohibitions on exchange of printed matter, or on humanitarian contributions as an expression of religious convictions.

*Id.* at 11.

We are constrained to take a cautious view of statutory authority for this presidential option because of the Supreme Court's emphasis on the need for clear statutory authority for executive action significantly affecting constitutional liberties. *See Kent* v. *Dulles,* 357 U.S. 116, 129 (1958). Thus, we do not regard either the COMSAT statute or 22 U.S.C. § 1732 as sufficiently clear warrant for presidential action directed at satellite communications themselves, and not part of a broader restriction. Nor does a more limited ban on commercial transmissions commend itself. Distinctions between these communications and news or personal communications are tricky at best, and even commercial speech now enjoys some constitutional protection. *See generally Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976).

The First Amendment issue can take either of two forms. Any presidential action that constitutes a direct restraint on the content of speech must meet a very high standard of review. The government must show a "compelling interest," a close logical nexus between that interest and the restriction, and a narrow tailoring of the restriction to

avoid overbreadth. *See, e.g., Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95–96 (1972). And if the scheme involves a prior restraint by licensing particular communications, it bears "a heavy presumption against its constitutional validity," *New York Times Co. v. United States,* 403 U.S. 713, 714 (1971). In the abstract, it is difficult to envision a justification for a direct ban on satellite communications that could clear these hurdles. If attempted, it should include an exception in the terms of § 1702(b)(1) of the IEEPA.

An indirect restriction on speech has a better chance of success. Here, that issue would arise if a ban on satellite communications were part of a more general ban on financial transactions with Iran and its nationals. *See Kleindienst v. Mandel,* 408 U.S. 753 (1972), upholding the government's right to exclude an alien lecturer under speech-neutral criteria in the immigration laws, despite the undoubted rights of Americans to receive ideas from abroad. The Supreme Court's clearest statement of the criteria for reviewing indirect restraints on speech occurred in *United States v. O'Brien,* 391 U.S. 367, 377 (1968). The Court set forth four requirements necessary to sustain a restriction: (1) whether it is within the constitutional power of the government; (2) whether it furthers an important or substantial governmental interest; (3) whether the governmental interest is unrelated to the suppression of free expression; and (4) whether the incidental restriction on alleged First Amendment freedoms is any greater than is essential to the furtherance of that interest.[6] Thus, a presidential action against Iran that sweeps up satellite communications in a wider net should be permissible. Again, an exception in the terms of § 1702(b)(1) would be necessary to the extent the IEEPA is the source of authority, and would help to satisfy the *O'Brien* test.

### 7. Block Iran's International Communications by Denying Access to Intelsat

The Intelsat Agreement, Aug. 20, 1971, 23 U.S.T. 3813 T.I.A.S. No. 7532, does not have a specific provision which allows a member's communications to be cut off. The provisions regarding involuntary withdrawal (Art. XVI) all seem to be predicated on failure of a party to live up to its obligations under the Intelsat Agreement. We have no information as to whether Iran is in compliance with the Agreement. The State Department has suggested that denial of access could be accomplished by an extraordinary assembly of the parties and could be

---

[6] The *O'Brien* case was applied in a series of lower court decisions which upheld restrictions on the importation of publications and films under the Trading with the Enemy Act, the IEEPA's predecessor. *Teague v. Regional Comm'r of Customs,* 404 F.2d 441, 445 (2d Cir. 1968), *cert. denied,* 394 U.S. 977 (1969); *American Documentary Files v. Secretary of the Treasury,* 344 F. Supp. 703 (S.D.N.Y. 1972); *cf. Welch v. Kennedy,* 319 F. Supp. 945 (D.D.C. 1970). A similar conclusion was reached by the Third Circuit in *Veterans and Reservists for Peace in Vietnam v. Regional Comm'r of Customs,* 459 F. 2d 676 (3d Cir.), *cert. denied,* 409 U.S. 933 (1972).

accomplished by a two-thirds vote of the 102 members. (Art. VII (e) and (f)). There is no precedent for this, and it is not clear to us whether this power exists.

### 8. Prohibit Financial Transactions Involving U.S. Journalists in Iran, or Otherwise Limit Travel to Iran

Under stated conditions, the President may prevent American citizens from traveling to particular countries at particular times.[7] In 1978, Congress dealt with this subject in an amendment to 22 U.S.C. § 211a, the statute authorizing the Secretary of State to issue passports. The amendment provided:

> Unless authorized by law, a passport may not be designated as restricted for travel to or for use in any country other than a country with which the United States is at war, where armed hostilities are in progress, or where there is imminent danger to the public health or the physical safety of United States travellers.

Present circumstances obviously satisfy the last condition of § 211a; the President may restrict future travel to Iran. *See Zemel* v. *Rusk,* 381 U.S. 1 (1965), upholding the President's power to refuse to validate passports for Cuba under an earlier version of this statute. Nevertheless, travel restrictions applied to journalists may pose special problems. The press could bring a lawsuit challenging the government to make a factual showing sufficient to satisfy *O'Brien, supra,* concerning whether there is a need to include journalists in a travel ban in view of their safety to date. Such a suit would probably require at least *in camera* disclosure of the government's reasons for the restrictions. Moreover, restrictions on travel to Iran would have no immediate effect on persons already in that country.

The IEEPA could be used for a broad ban on financial transactions between Americans and Iran or its nationals. Such an order would apply to Americans overseas, and would make further financial transactions with Iranians subject to penalty.

---

[7] This power to restrict the travel of American citizens generally to a particular place at a particular time is distinct from the power to inhibit the travel of an individual by revoking his passport on the basis of a determination that his activities "are causing or are likely to cause serious damage to the national security or the foreign policy of the United States." *See* 22 C.F.R. § 51.70(b)(4). The existence and scope of this latter power are currently being litigated. *See Agee* v. *Vance,* 483 F. Supp. 729 (D.D.C. 1980), *appeal docketed.* [NOTE: In the cited case, the Supreme Court upheld the President's power, under applicable laws and regulations, to revoke a U.S. citizen's passport on national security and foreign policy grounds. *Haig* v. *Agee,* 453 U.S. 280 (1981). Ed.]

231

## 9. Divert Equipment From the Suspended Iran
## Foreign Military Sales Pipeline

The present Iranian government took the initiative in canceling the great bulk of foreign military sales contracts with the United States. Near the end of last year, the United States government suspended the rest pursuant to terms of the contracts. It is legally possible that the contracts could still be reinstituted since they have not been cancelled. We understand from the State Department that nothing in the contracts would preclude our making other disposition of the articles being procured while the contracts are suspended.

## 10. A Broad Prohibition Against All Transactions Between Americans
## Relating to Iran

The preceding analysis suggests that very broad restrictions are permissible under the IEEPA. A caveat is in order, however. The statute is limited to property in which a foreign country or foreign national has an interest. As we noted above, Treasury's regulations define the operative terms of § 1702 to include many kinds of legal interests and their direct or indirect transfer. Thus, it would seem possible to reach transactions in which Iran has an indirect interest, but it is not possible to reach "purely domestic" transactions.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*